# ILLINOIS *v.* SOMERVILLE

No. 71–692.  Argued November 13, 1972—
Decided February 27, 1973

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and POWELL, JJ., joined. WHITE, J., filed a dissenting opinion, in which DOUGLAS and BRENNAN, JJ., joined, *post,* p. 471. MARSHALL, J., filed a dissenting opinion, *post,* p. 477.

*E. James Gildea,* Assistant Attorney General of Illinois, argued the cause for petitioner.  With him on the brief were *William J. Scott,* Attorney General, and *James B. Zagel,* Assistant Attorney General.

*Ronald P. Alwin* argued the cause for respondent. With him on the brief was *Martin S. Gerber.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

We must here decide whether declaration of a mistrial over the defendant's objection, because the trial court concluded that the indictment was insufficient to charge a crime, necessarily prevents a State from subsequently trying the defendant under a valid indictment. We hold that the mistrial met the "manifest necessity" requirement of our cases, since the trial court could reasonably have concluded that the "ends of public justice" would be defeated by having allowed the trial to continue. Therefore, the Double Jeopardy Clause of the Fifth Amendment, made applicable to the States through the Due Process Clause of the Fourteenth Amendment, *Benton* v. *Maryland,* 395 U. S. 784 (1969), did not bar retrial under a valid indictment.

I

On March 19, 1964, respondent was indicted by an Illinois grand jury for the crime of theft. The case was called for trial and a jury impaneled and sworn on November 1, 1965. The following day, before any evidence had been presented, the prosecuting attorney realized that the indictment was fatally deficient under Illinois law because it did not allege that respondent intended to permanently deprive the owner of his property. Under the applicable Illinois criminal statute, such intent is a necessary element of the crime of theft,[1] and failure to allege intent renders the indictment insufficient to charge a crime. But under the Illinois Constitution at that time,[2] an indictment was the sole means by which a crimi-

---

[1] Ill. Rev. Stat., c. 38, § 16–1 (d)(1) (1963).

[2] See Constitution of Illinois, Art. II, § 8 (1967). When the State Constitution was amended in 1970, this provision was retained as the first paragraph of Art. I, § 7.

nal proceeding such as this might be commenced against a defendant. Illinois further provides that only formal defects, of which this was not one, may be cured by amendment. The combined operation of these rules of Illinois procedure and substantive law meant that the defect in the indictment was "jurisdictional"; it could not be waived by the defendant's failure to object, and could be asserted on appeal or in a post-conviction proceeding to overturn a final judgment of conviction.

Faced with this situation, the Illinois trial court concluded that further proceedings under this defective indictment would be useless and granted the State's motion for a mistrial. On November 3, the grand jury handed down a second indictment alleging the requisite intent. Respondent was arraigned two weeks after the first trial was aborted, raised a claim of double jeopardy which was overruled, and the second trial commenced shortly thereafter. The jury returned a verdict of guilty, sentence was imposed, and the Illinois courts upheld the conviction. Respondent then sought federal habeas corpus, alleging that the conviction constituted double jeopardy contrary to the prohibition of the Fifth and Fourteenth Amendments. The Seventh Circuit affirmed the denial of habeas corpus prior to our decision in *United States* v. *Jorn,* 400 U. S. 470 (1971). The respondent's petition for certiorari was granted, and the case remanded for reconsideration in light of *Jorn* and *Downum* v. *United States,* 372 U. S. 734 (1963). On remand, the Seventh Circuit held that respondent's petition for habeas corpus should have been granted because, although he had not been tried and *acquitted* as in *United States* v. *Ball,* 163 U. S. 662 (1896), and *Benton* v. *Maryland,* 395 U. S. 784 (1969), jeopardy had attached when the jury was impaneled and sworn, and a declaration of mistrial over respondent's objection precluded a retrial

under a valid indictment. 447 F. 2d 733 (1971). For the reasons stated below, we reverse that judgment.

## II

The fountainhead decision construing the Double Jeopardy Clause in the context of a declaration of a mistrial over a defendant's objection is *United States* v. *Perez,* 9 Wheat. 579 (1824). Mr. Justice Story, writing for a unanimous Court, set forth the standards for determining whether a retrial, following a declaration of a mistrial over a defendant's objection, constitutes double jeopardy within the meaning of the Fifth Amendment. In holding that the failure of the jury to agree on a verdict of either acquittal or conviction did not bar retrial of the defendant, Mr. Justice Story wrote:

"We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office." *Id.,* at 580.

This formulation, consistently adhered to by this Court in subsequent decisions, abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial. The broad discretion reserved to the trial judge in such circumstances has been consistently reiterated in decisions of this Court. In *Wade* v. *Hunter,* 336 U. S. 684 (1949), the Court, in reaffirming this flexible standard, wrote:

> "We are asked to adopt the *Cornero* [v. *United States,* 48 F. 2d 69,] rule under which petitioner contends the absence of witnesses can never justify discontinuance of a trial. Such a rigid formula is inconsistent with the guiding principles of the *Perez* decision to which we adhere. Those principles command courts in considering whether a trial should be terminated without judgment to take 'all circumstances into account' and thereby forbid the mechanical application of an abstract formula. The value of the *Perez* principles thus lies in their capacity for informed application under widely different circumstances without injury to defendants or to the public interest." *Id.,* at 691.

Similarly, in *Gori* v. *United States,* 367 U. S. 364 (1961), the Court again underscored the breadth of a trial judge's discretion, and the reasons therefor, to declare a mistrial.

> "Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment." *Id.,* at 368.

In reviewing the propriety of the trial judge's exercise of his discretion, this Court, following the counsel of Mr.

Justice Story, has scrutinized the action to determine whether, in the context of that particular trial, the declaration of a mistrial was dictated by "manifest necessity" or the "ends of public justice." The interests of the public in seeing that a criminal prosecution proceed to verdict, either of acquittal or conviction, need not be forsaken by the formulation or application of rigid rules that necessarily preclude the vindication of that interest. This consideration, whether termed the "ends of public justice," *United States* v. *Perez, supra,* at 580, or, more precisely, "the public's interest in fair trials designed to end in just judgments," *Wade* v. *Hunter, supra,* at 689, has not been disregarded by this Court.

In *United States* v. *Perez, supra,* and *Logan* v. *United States,* 144 U. S. 263 (1892), this Court held that "manifest necessity" justified the discharge of juries unable to reach verdicts, and, therefore, the Double Jeopardy Clause did not bar retrial. Cf. *Keerl* v. *Montana,* 213 U. S. 135 (1909); *Dreyer* v. *Illinois,* 187 U. S. 71 (1902). In *Simmons* v. *United States,* 142 U. S. 148 (1891), a trial judge dismissed the jury, over defendant's objection, because one of the jurors had been acquainted with the defendant, and, therefore, was probably prejudiced against the Government; this Court held that the trial judge properly exercised his power "to prevent the defeat of the ends of public justice." *Id.,* at 154. In *Thompson* v. *United States,* 155 U. S. 271 (1894), a mistrial was declared after the trial judge learned that one of the jurors was disqualified, he having been a member of the grand jury that indicted the defendant. Similarly, in *Lovato* v. *New Mexico,* 242 U. S. 199 (1916), the defendant demurred to the indictment, his demurrer was overruled, and a jury sworn. The district attorney, realizing that the defendant had not pleaded to the indictment after the demurrer had been overruled, moved for the discharge of the jury and arraignment of the defendant for pleading; the jury

was discharged, the defendant pleaded not guilty, the same jury was again impaneled, and a verdict of guilty rendered. In both of those cases this Court held that the Double Jeopardy Clause did not bar reprosecution.

While virtually all of the cases turn on the particular facts and thus escape meaningful categorization, see *Gori* v. *United States, supra; Wade* v. *Hunter, supra,* it is possible to distill from them a general approach, premised on the "public justice" policy enunciated in *United States* v. *Perez,* to situations such as that presented by this case. A trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial. If an error would make reversal on appeal a certainty, it would not serve "the ends of public justice" to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court. This was substantially the situation in both *Thompson* v. *United States, supra,* and *Lovato* v. *New Mexico, supra.* While the declaration of a mistrial on the basis of a rule or a defective procedure that would lend itself to prosecutorial manipulation would involve an entirely different question, cf. *Downum* v. *United States, supra,* such was not the situation in the above cases or in the instant case.

In *Downum* v. *United States,* the defendant was charged with six counts of mail theft, and forging and uttering stolen checks. A jury was selected and sworn in the morning, and instructed to return that afternoon. When the jury returned, the Government moved for the discharge of the jury on the ground that a key prosecution witness, for two of the six counts against defendant, was not present. The prosecution knew, prior to the selection and swearing of the jury, that this witness

could not be found and had not been served with a subpoena. The trial judge discharged the jury over the defendant's motions to dismiss two counts for failure to prosecute and to continue the other four. This Court, in reversing the convictions on the ground of double jeopardy, emphasized that "[e]ach case must turn on its facts," 372 U. S., at 737, and held that the second prosecution constituted double jeopardy, because the absence of the witness and the reason therefor did not there justify, in terms of "manifest necessity," the declaration of a mistrial.

In *United States* v. *Jorn, supra,* the Government called a taxpayer witness in a prosecution for willfully assisting in the preparation of fraudulent income tax returns. Prior to his testimony, defense counsel suggested he be warned of his constitutional right against compulsory self-incrimination. The trial judge warned him of his rights, and the witness stated that he was willing to testify and that the Internal Revenue Service agent who first contacted him warned him of his rights. The trial judge, however, did not believe the witness' declaration that the IRS had so warned him, and refused to allow him to testify until after he had consulted with an attorney. After learning from the Government that the remaining four witnesses were "similarly situated," and after surmising that they, too, had not been properly informed of their rights, the trial judge declared a mistrial to give the witnesses the opportunity to consult with attorneys. In sustaining a plea in bar of double jeopardy to an attempted second trial of the defendant, the plurality opinion of the Court, emphasizing the importance to the defendant of proceeding before the first jury sworn, concluded:

"It is apparent from the record that no consideration was given to the possibility of a trial continuance; indeed, the trial judge acted so abruptly in

discharging the jury that, had the prosecutor been disposed to suggest a continuance, or the defendant to object to the discharge of the jury, there would have been no opportunity to do so. When one examines the circumstances surrounding the discharge of this jury, it seems abundantly apparent that the trial judge made no effort to exercise a sound discretion to assure that, taking all the circumstances into account, there was a manifest necessity for the *sua sponte* declaration of this mistrial. *United States* v. *Perez,* 9 Wheat., at 580. Therefore, we must conclude that in the circumstances of this case, appellee's reprosecution would violate the double jeopardy provision of the Fifth Amendment." 400 U. S., at 487.

### III

Respondent advances two arguments to support the conclusion that the Double Jeopardy Clause precluded the second trial in the instant case. The first is that since *United States* v. *Ball,* 163 U. S. 662 (1896), held that jeopardy obtained even though the indictment upon which the defendant was first acquitted had been defective, and since *Downum* v. *United States, supra,* held that jeopardy "attaches" when a jury has been selected and sworn, the Double Jeopardy Clause precluded the State from instituting the second proceeding that resulted in respondent's conviction. Alternatively, respondent argues that our decision in *United States* v. *Jorn, supra,* which respondent interprets as narrowly limiting the circumstances in which a mistrial is manifestly necessary, requires affirmance. Emphasizing the " 'valued right to have his trial completed by a particular tribunal,' " *United States* v. *Jorn, supra,* at 484, quoting *Wade* v. *Hunter,* 336 U. S., at 689, respondent contends that the circumstances did not justify depriving him of that right.

Respondent's first contention is precisely the type of rigid, mechanical rule which the Court had eschewed since the seminal decision in *Perez.* The major premise of the syllogism—that trial on a defective indictment precludes retrial—is not applicable to the instant case because it overlooks a crucial element of the Court's reasoning in *United States* v. *Ball, supra.* There, three men were indicted and tried for murder; two were convicted by a jury and one acquitted. This Court reversed the convictions on the ground that the indictment was fatally deficient in failing to allege that the victim died within a year and a day of the assault. *Ball* v. *United States,* 140 U. S. 118 (1891). A proper indictment was returned and the Government retried all three of the original defendants; that trial resulted in the conviction of all. This Court reversed the conviction of the one defendant who originally had been acquitted, sustaining his plea of double jeopardy. But the Court was obviously and properly influenced by the fact that the first trial had proceeded to verdict. This focus of the Court is reflected in the opinion:

> "[W]e are unable to resist the conclusion that a general verdict of acquittal upon the issue of not guilty to an indictment undertaking to charge murder, and not objected to before the verdict as insufficient in that respect, is a bar to a second indictment for the same killing.
>
> ". . . [T]he accused, *whether convicted or acquitted,* is equally put in jeopardy at the first trial. . . ." 163 U. S., at 669 (emphasis added).

In *Downum,* the Court held, as respondent argues, that jeopardy "attached" when the first jury was selected and sworn. But in cases in which a mistrial has been declared prior to verdict, the conclusion that jeopardy has attached begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause bars retrial.

That, indeed, was precisely the rationale of *Perez* and subsequent cases. Only if jeopardy has attached is a court called upon to determine whether the declaration of a mistrial was required by "manifest necessity" or the "ends of public justice."

We believe that in light of the State's established rules of criminal procedure, the trial judge's declaration of a mistrial was not an abuse of discretion. Since this Court's decision in *Benton* v. *Maryland, supra,* federal courts will be confronted with such claims that arise in large measure from the often diverse procedural rules existing in the 50 States. Federal courts should not be quick to conclude that simply because a state procedure does not conform to the corresponding federal statute or rule, it does not serve a legitimate state policy. Last Term, recognizing this fact, we dismissed a writ of certiorari as improvidently granted in a case involving a claim of double jeopardy stemming from the dismissal of an indictment under the "rules of criminal pleading peculiar to" an individual State followed by a retrial under a proper indictment. *Duncan* v. *Tennessee,* 405 U. S. 127 (1972).

In the instant case, the trial judge terminated the proceeding because a defect was found to exist in the indictment that was, as a matter of Illinois law, not curable by amendment. The Illinois courts have held that even after a judgment of conviction has become final, the defendant may be released on habeas corpus, because the defect in the indictment deprives the trial court of "jurisdiction." The rule prohibiting the amendment of all but formal defects in indictments is designed to implement the State's policy of preserving the right of each defendant to insist that a criminal prosecution against him be commenced by the action of a grand jury. The trial judge was faced with a situation similar to those in *Simmons, Lovato,* and *Thompson,* in which a

procedural defect might or would preclude the public from either obtaining an impartial verdict or keeping a verdict of conviction if its evidence persuaded the jury. If a mistrial were constitutionally unavailable in situations such as this, the State's policy could only be implemented by conducting a second trial after verdict and reversal on appeal, thus wasting time, energy, and money for all concerned. Here, the trial judge's action was a rational determination designed to implement a legitimate state policy, with no suggestion that the implementation of that policy in this manner could be manipulated so as to prejudice the defendant. This situation is thus unlike *Downum,* where the mistrial entailed not only a delay for the defendant, but also operated as a post-jeopardy continuance to allow the prosecution an opportunity to strengthen its case. Here, the delay was minimal, and the mistrial was, under Illinois law, the only way in which a defect in the indictment could be corrected. Given the established standard of discretion set forth in *Perez, Gori,* and *Hunter,* we cannot say that the declaration of a mistrial was not required by "manifest necessity" or the "ends of public justice."

Our decision in *Jorn,* relied upon by the court below and respondent, does not support the opposite conclusion. While it is possible to excise various portions of the plurality opinion to support the result reached below, divorcing the language from the facts of the case serves only to distort its holdings. That opinion dealt with action by a trial judge that can fairly be described as erratic. The Court held that the lack of apparent harm to the defendant from the declaration of a mistrial did not itself justify the mistrial, and concluded that there was no "manifest necessity" for the mistrial, as opposed to less drastic alternatives. The Court emphasized that the absence of any manifest need for the mistrial had

deprived the defendant of his right to proceed before the first jury, but it did not hold that that right may never be forced to yield, as in this case, to "the public's interest in fair trials designed to end in just judgments." The Court's opinion in *Jorn* is replete with approving references to *Wade* v. *Hunter, supra,* which latter case stated:

> "The double-jeopardy provision of the Fifth Amendment, however, does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment. Such a rule would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed. There may be unforeseeable circumstances that arise during a trial making its completion impossible, such as the failure of a jury to agree on a verdict. In such event the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again. And there have been instances where a trial judge has discovered facts during a trial which indicated that one or more members of the jury might be biased against the Government or the defendant. It is settled that the duty of the judge in this event is to discharge the jury and direct a retrial. *What has been said is enough to show that a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."* *Wade* v. *Hunter,* 336 U. S., at 688–689 (footnote omitted; emphasis added).

The determination by the trial court to abort a criminal proceeding where jeopardy has attached is not one to be lightly undertaken, since the interest of the defendant in having his fate determined by the jury first impaneled is itself a weighty one. *United States* v. *Jorn, supra.* Nor will the lack of demonstrable additional prejudice preclude the defendant's invocation of the double jeopardy bar in the absence of some important countervailing interest of proper judicial administration. *Ibid.* But where the declaration of a mistrial implements a reasonable state policy and aborts a proceeding that at best would have produced a verdict that could have been upset at will by one of the parties, the defendant's interest in proceeding to verdict is outweighed by the competing and equally legitimate demand for public justice. *Wade* v. *Hunter, supra.*

*Reversed.*

MR. JUSTICE WHITE, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

For the purposes of the Double Jeopardy Clause, jeopardy attaches when a criminal trial commences before judge or jury, *United States* v. *Jorn,* 400 U. S. 470, 479–480 (1971); *Green* v. *United States,* 355 U. S. 184, 188 (1957); *Wade* v. *Hunter,* 336 U. S. 684, 688 (1949), and this point has arrived when a jury has been selected and sworn, even though no evidence has been taken. *Downum* v. *United States,* 372 U. S. 734 (1963). Clearly, Somerville was placed in jeopardy at his first trial despite the fact that the indictment against him was defective under Illinois law. *Benton* v. *Maryland,* 395 U. S. 784, 796–797 (1969); *United States* v. *Ball,* 163 U. S. 662 (1896). The question remains, however, whether the facts of this case present one of those circumstances where a trial, once begun, may be aborted over the defendant's objection and the defendant retried

without twice being placed in jeopardy contrary to the Constitution.

The Court has frequently addressed itself to the general problem of mistrials and the Double Jeopardy Clause, most recently in *United States* v. *Jorn, supra.* We have abjured mechanical, *per se* rules and have preferred to rely upon the approach first announced in *United States* v. *Perez,* 9 Wheat. 579 (1824). Under the *Perez* analysis, a trial court has authority to discharge a jury prior to verdict, and the Double Jeopardy Clause will not prevent retrial, only if the trial court takes "all the circumstances into consideration" and in its "sound discretion" determines that "there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *Id.,* at 580. See also *United States* v. *Jorn, supra,* at 480–481 (opinion of Harlan, J.); *id.,* at 492 (STEWART, J., dissenting); *Gori* v. *United States,* 367 U. S. 364, 367–369 (1961); *id.,* at 370–373 (DOUGLAS, J., dissenting); *Downum* v. *United States, supra,* at 735–736, *id.,* at 740 (Clark, J., dissenting). Despite the generality of the *Perez* standard, some guidelines have evolved from past cases, as this Court has reviewed the exercise of trial court discretion in a variety of circumstances.

*United States* v. *Jorn, supra,* and *Downum* v. *United States, supra,* for example, make it abundantly clear that trial courts should have constantly in mind the purposes of the Double Jeopardy Clause to protect the defendant from continued exposure to embarrassment, anxiety, expense, and restrictions on his liberty, as well as to preserve his " 'valued right to have his trial completed by a particular tribunal.' " *United States* v. *Jorn, supra,* at 484, quoting from *Wade* v. *Hunter,* 336 U. S., at 689.

> "[I]n the final analysis, the judge must always temper the decision whether or not to abort the trial

by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *United States* v. *Jorn, supra,* at 486.

It was in light of this interest that the Court in *Downum* reversed a conviction on double jeopardy grounds where a mistrial was declared to permit further efforts to secure the attendance of a key prosecution witness who should have been, but was not, subpoenaed. Although no prosecutorial misconduct other than mere oversight and mistake was claimed or proved, the policies of the Double Jeopardy Clause, and the interest of the defendant in taking his case to the jury that he had just accepted, were sufficient to raise the double jeopardy barrier to a second trial.

Similarly, in *Jorn,* a trial was terminated when the trial judge, *sua sponte* and mistakenly, declared a mistrial, apparently to protect nonparty witnesses from the possibility of self-incrimination. There was no showing of intent by the prosecutor or the judge to harass the defendant or to enhance chances of conviction at a second trial; the defendant was given a complete preview of the Government's case, and no specific prejudice to the defense at a second trial was shown. Noting that the courts "must bear in mind the potential risks of abuse by the defendant of society's unwillingness to unnecessarily subject him to repeated prosecutions," 400 U. S., at 486, this Court held that the defendant's interest in submitting his case to the initial jury was itself sufficient to invoke the Double Jeopardy Clause and, as in *Downum,* to override the Government's concern with enforcing the criminal laws by having another chance to try the defendant for the crime with which he was charged. In neither case was there "manifest necessity" for a mistrial and a double trial of the defendant.

Very similar considerations govern this case. Somerville asserts a right to but one trial and to a verdict by the initial jury. A mistrial was directed at the instance of the State, over Somerville's objection, and was occasioned by official error in drafting the indictment— error unaccompanied by bad faith, overreaching, or specific prejudice to the defense at a later trial. The State may no more try the defendant a second time in these circumstances than could the United States in *Downum* and *Jorn.* Although the exact extent of the emotional and physical harm suffered by Somerville during the period between his first and second trial is open to debate, it cannot be gainsaid that Somerville lost "his option to go to the first jury and, perhaps, end the dispute then and there with an acquittal." *United States* v. *Jorn,* 400 U. S., at 484. *Downum* and *Jorn,* over serious dissent, rejected the view that the Double Jeopardy Clause protects only against those mistrials that lend themselves to prosecutorial manipulation and underwrote the independent right of a defendant in a criminal case to have the verdict of the initial jury. Both cases made it quite clear that the discretion of the trial court to declare mistrials is reviewable and that the defendant's right to a verdict by his first jury is not to be overridden except for "manifest necessity." There was not, in this case any more than in *Downum* and *Jorn,* "manifest necessity" for the loss of that right.

The majority recognizes that "the interest of the defendant in having his fate determined by the jury first impaneled is itself a weighty one," but finds that interest outweighed by the State's desire to avoid "conducting a second trial after verdict and reversal on appeal [on the basis of a defective indictment], thus wasting time, energy, and money for all concerned." The majority finds paramount the interest of the State in "keeping a verdict of conviction if its evidence persuaded the jury." Such

analysis, however, completely ignores the possibility that the defendant might be acquitted by the initial jury. It is, after' all, that possibility—the chance to "end the dispute then and there with an acquittal," *United States* v. *Jorn, supra,* at 484—that makes the right to a trial before a particular tribunal of importance to a defendant. In addition, the majority's balancing gives too little weight to the fundamental place of the Double Jeopardy Clause, and the purposes which it seeks to serve, in "the framework of procedural protections which the Constitution establishes for the conduct of a criminal trial." *Id.,* at 479.

Apparently the majority finds "manifest necessity" for a mistrial and the retrial of the defendant in "the State's policy of preserving the right of each defendant to insist that a criminal prosecution against him be commenced by the action of a grand jury" and the implementation of that policy in the absence from Illinois procedural rules of any procedure for the amendment of indictments. Conceding the reasonableness of such a policy, it must be remembered that the inability to amend an indictment does not come into play, and a mistrial is not necessitated, unless an error on the part of the State in the framing of the indictment is committed. Only when the indictment is defective—only when the State has failed to properly execute its responsibility to frame a proper indictment—does the State's procedural framework necessitate a mistrial.

Although recognizing that "a criminal trial is, even in the best of circumstances, a complicated affair to manage," *ibid.,* the Court has not previously thought prosecutorial error sufficient excuse for not applying the Double Jeopardy Clause. In *Jorn,* for instance, the Court declared that "unquestionably an important factor to be considered is the need to hold litigants on both sides to standards of responsible professional conduct in the clash of an ad-

versary criminal process," *id.*, at 485–486, and cautioned, "The trial judge must recognize that lack of preparedness by the Government . . . directly implicates policies underpinning both the double jeopardy provision and the speedy trial guarantee." *Id.*, at 486. See also *id.*, at 487–488 (BURGER, C. J., concurring); *Downum* v. *United States,* 372 U. S., at 737. Here, the prosecutorial error, not the independent operation of a state procedural rule, necessitated the mistrial. Judged by the standards of *Downum* and *Jorn* I cannot find, in the words of the majority, an "important countervailing interest of proper judicial administration" in this case; I cannot find "manifest necessity" for a mistrial to compensate for prosecutorial mistake.

Finally, the majority notes that "the declaration of a mistrial on the basis of a rule or a defective procedure that would lend itself to prosecutorial manipulation would involve an entirely different question." See *United States* v. *Jorn,* 400 U. S., at 479; *Downum* v. *United States, supra; Green* v. *United States,* 355 U. S., at 187–188. Surely there is no evidence of bad faith or overreaching on this record. However, the words of the Court in *Ball* seem particularly appropriate.

> "This case, in short, presents the novel and unheard of spectacle, of a public officer, whose business it was to frame a correct bill, openly alleging his own inaccuracy or neglect, as a reason for a second trial, when it is not pretended that the merits were not fairly in issue on the first. . . . If this practice be tolerated, when are trials of the accused to end? If a conviction take place, whether an indictment be good, or otherwise, it is ten to one that judgment passes; for, if he read the bill, it is not probable he will have penetration enough to discern its defects. His counsel, if any be assigned to him, will be content with hearing the substance of the charge with-

out looking farther; and the court will hardly, of its own accord, think it a duty to examine the indictment to detect errors in it. Many hundreds, perhaps, are now in the state prison on erroneous indictments, who, however, have been fairly tried on the merits." 163 U. S., at 667–668.

I respectfully dissent.

MR. JUSTICE MARSHALL, dissenting.

The opinion of the Court explicitly disclaims the suggestion that it overrules the recent cases of *United States* v. *Jorn,* 400 U. S. 470 (1971), and *Downum* v. *United States,* 372 U. S. 734 (1963). *Ante,* at 469. But the Court substantially eviscerates the rationale of those cases. *Jorn* and *Downum* appeared to give judges some guidance in determining what constituted a "manifest necessity" for declaring a mistrial over a defendant's objection. Today the Court seems to revert to a totally unstructured analysis of such cases. I believe that one of the strengths of the articulation of legal rules in a series of cases is that successive cases present in a clearer focus considerations only vaguely seen earlier. Cases help delineate the factors to be considered and suggest how they ought to affect the result in particular situations. That is what *Jorn* and *Downum* did. The Court, it seems to me, today abandons the effort in those cases to suggest the importance of particular factors, and adopts a general "balancing" test which, even on its own terms, the Court improperly applies to this case.

The majority purports to balance the manifest necessity for declaring a mistrial, *ante,* at 463, the public interest "in seeing that a criminal prosecution proceed to verdict," *ibid.,* and the interest in assuring impartial verdicts, *ante,* at 464. The second interest is obviously present in every case, and placing it in the balance cannot alter the result of the analysis of differ-

ent cases. It is, at most, a constant whose importance a judge must consider when weighing other factors on which the availability of the double jeopardy defense depends.

At the same time, the balance that the majority strikes essentially ignores the importance of a factor which was determinative in *Jorn* and *Downum:* the accused's interest in his "valued right to have his trial completed by a particular tribunal," *Wade* v. *Hunter,* 336 U. S. 684, 689 (1949), quoted in *United States* v. *Jorn,* 400 U. S., at 484. This is not a factor which is excised from isolated passages of *Jorn,* as the majority would have it, *ante,* at 469; it is the core of that case, as even the most cursory reading will disclose. See, *e. g.,* 400 U. S., at 479, 484–486.

By mischaracterizing *Jorn* and *Downum,* the Court finds it possible to reach today's result. A fair reading of those cases shows how the balance should properly be struck here. The first element to be considered is the necessity for declaring a mistrial. That I take to mean consideration of the alternatives available to the judge confronted with a situation in the midst of trial that seems to require correction. In *Downum,* for example, a key prosecution witness was not available when the case was called for trial, because of the prosecutor's negligence. Because the witness was essential to presentation of only two of the six counts concerning *Downum,* there was no necessity to declare a mistrial as to all six. Trial could have proceeded on the four counts for which the prosecution was ready. *Downum* v. *United States,* 372 U. S., at 737. Similarly, in *Jorn,* the District Judge precipitately aborted the trial in order to protect the rights of prospective witnesses. Again, the alternative of interrupting the trial briefly so that the witnesses might consult with attorneys was available but not invoked. *United States* v. *Jorn,* 400 U. S., at 487.

A superficial examination of this case might suggest that there were no alternatives except to proceed where "reversal on appeal [would be] a certainty" *ante,* at 464. Respondent had been indicted for "knowingly obtain[ing] unauthorized control over stolen property, to wit: thirteen hundred dollars in United States Currency, the property of Zayre of Bridgeview, Inc., a corporation, knowing the same to have been stolen by another in violation of Chapter 38, Section 16–1 (d) of the Illinois Revised Statutes." Petition for Writ of Certiorari 3. The statute named in the indictment requires that the defendant have "[i]ntend[ed] to deprive the owner permanently of the use or benefit of the property." Ill. Rev. Stat., c. 38, § 16–1 (d)(1) (1963).

The majority treats it as unquestionably clear that the failure to allege that intent in the indictment made the indictment fatally defective. And indeed, since the time of the trial of this case, Illinois courts have so held. See, *e. g., People* v. *Matthews,* 122 Ill. App. 2d 264, 258 N. E. 2d 378 (1970); *People* v. *Hayn,* 116 Ill. App. 2d 241, 253 N. E. 2d 575 (1969). But the answer was not so clear when the trial judge made his decision. The Illinois Code of Criminal Procedure had just recently been amended to require that an indictment name the offense and the statutory provision alleged to have been violated, and that it set forth the nature and elements of the offense charged. Ill. Rev. Stat., c. 38, § 111–3 (a) (1963). The indictment here was sufficiently detailed to meet the federal requirement that the indictment "contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet,' " *Hagner* v. *United States,* 285 U. S. 427, 431 (1932); see also *Russell* v. *United States,* 369 U. S. 749 (1962).

Had the Illinois courts been made aware of the substantial constitutional questions raised by rigid applica-

tion of an archaic mode of reading indictments, they might well have refused to hold that the defect in the indictment here was jurisdictional and nonwaivable. Conscientious state trial judges certainly must attempt to anticipate the course of interpretation of state law. But they must also contribute to that course by pointing out the constitutional implications of alternative interpretations. By doing so, they would themselves help shape the interpretation of state law. Here, for example, had the trial judge refused to declare a mistrial because of his constitutional misgivings about the implications of that course, he might have prevented what Chief Justice Underwood has called a "reversion to an overly technical, highly unrealistic and completely undesirable type of formalism in pleading which . . . serves no useful purpose," in interpreting the Code of Criminal Procedure. *People ex rel. Ledford* v. *Brantley,* 46 Ill. 2d 419, 423, 263 N. E. 2d 27, 29 (1970) (Underwood, C. J., dissenting). A trial judge in 1965 might have forestalled that unhappy development. Thus, he could have proceeded to try the case on the first indictment, risking reversal as any trial judge does when making rulings of law, but with no guarantee of reversal. In proceeding with the trial, he would have fully protected the defendant's interest in having his trial completed by the jury already chosen.

If the only alternative to declaring a mistrial did require the trial judge to ignore the tenor of previous state decisional law, though, perhaps declaring a mistrial would have been a manifest necessity. But there obviously was another alternative. The trial judge could have continued the trial. The majority suggests that this would have been a useless charade. But to a defendant, forcing the Government to proceed with its proof would almost certainly not be useless. The Government might not persuade the jury of the defendant's guilt. The majority

concedes that the Double Jeopardy Clause would then bar a retrial. *Ante,* at 467; *United States* v. *Ball,* 163 U. S. 662 (1896). To assume that continuing the trial would be useless is to assume that conviction is inevitable. I would not structure the analysis of problems under the Double Jeopardy Clause on an assumption that appears to be inconsistent with the presumption of innocence.

Once it is shown that alternatives to the declaration of a mistrial existed, as they did here, we must consider whether the reasons which led to the declaration were sufficient, in light of those alternatives, to overcome the defendant's interest in trying the case to the jury. Here *Jorn* and *Downum* run directly counter to the holding today.

I would not characterize the District Judge's behavior in *Jorn* as "erratic," as the Court does, *ante,* at 469. His desire to protect the rights of prospective witnesses, who might have unknowingly implicated them in criminal activities if they testified, was hardly irrational. It, too, was "a legitimate state policy." *Ibid.* The defect in *Jorn* was the District Judge's failure to consider alternative courses of action, not the irrationality of the policy he sought to promote.

But even if I agreed with the majority's description of *Jorn,* that would not end the inquiry. I would turn to a consideration of the importance of the state policy that seemed to require declaring a mistrial, when weighed against the defendant's interest in concluding the trial with the jury already chosen.

Here again the majority mischaracterizes the state policy at stake here. What is involved is not, as the majority says, "the right of each defendant to insist that a criminal prosecution against him be commenced by the action of a grand jury." *Ante,* at 468. Rather, the interest is in making the defect in the indictment here jurisdictional and not waivable by a defendant.

Ordinarily, a defect in jurisdiction means that one institution has invaded the proper province of another. Such defects are not waivable because the State has an interest in preserving the allocation of competence between those institutions. Here, for example, the petit jury would invade the province of the grand jury if it returned a verdict of guilty on an improper indictment. However, allocation of jurisdiction is most important when one continuing body acts in the area of competence reserved to another continuing body. While it may be desirable to keep a single petit jury from invading the province of a single grand jury, surely that interest is not so substantial as to outweigh the "defendant's valued right to have his trial completed by a particular tribunal." *Wade* v. *Hunter*, 336 U. S. 684, 689 (1949). Cf. *Henry* v. *Mississippi*, 379 U. S. 443 (1965).

*Downum* v. *United States*, 372 U. S. 734 (1963), is an even harder case for the majority, which succeeds in distinguishing it only by misrepresenting the facts of the case. The majority treats *Downum* as a case involving a procedure "that would lend itself to prosecutorial manipulation." *Ante,* at 464. However, the facts in *Downum,* set out at 372 U. S., at 740–742 (Clark, J., dissenting), clearly show that the prosecutor's failure to have a crucial witness present was a negligent oversight. Except in the most attenuated sense that it may induce a prosecutor to fail to take steps to prevent such oversights, I cannot understand how negligence lends itself to manipulation. And even if I could understand that, I cannot understand how negligence in failing to draw an adequate indictment is different from negligence in failing to assure the presence of a crucial witness.[1]

---

[1] *Downum* may perhaps be read as stating a prophylactic rule. While the evil to be avoided is the intentional manipulation by the prosecutor of the availability of his witnesses, it may be extremely difficult to secure a determination of intentional manipulation. Proof

I believe that *Downum* and *Jorn* are controlling.[2]   As in those cases, the trial judge here did not pursue an available alternative, and the reason which led him to declare a mistrial was prosecutorial negligence, a reason that this Court found insufficient in *Downum*.   *Jorn* and *Downum* were in the tradition of elaboration of rules which give increasing guidance as case after case is decided.   I see no reason to abandon that tradition in this case and to adopt a new balancing test whose elements are stated on such a high level of abstraction as to give judges virtually no guidance at all in deciding subsequent cases.   I therefore respectfully dissent.

---

will inevitably be hard to come by.  And the relations between judges and prosecutors in many places may make judges reluctant to find intentional manipulation.  Thus, a general rule that the absence of crucial prosecution witnesses is not a reason for declaring a mistrial is necessary.  Although the abuses of misdrawing indictments are less apparent than those of manipulating the availability of witnesses, I believe that, even if *Downum* is based on the foregoing analysis—an analysis which appears nowhere in the opinion— a similar prophylactic rule is desirable here.

For example, in this case the State gained two weeks to strengthen a weak case.  This is far longer than the two-day delay in *Downum,* and, to the extent that the time was used to strengthen the case, the prosecutor could have capitalized on his previous negligence in drawing the indictment.

[2] So far I have read *Jorn* and *Downum* as restrictively as they can be fairly read.  But those cases, I believe, should be read more expansively.  They show to me that "manifest necessity" cannot be created by errors on the part of the prosecutor or judge; it must arise from some source outside their control.  *Wade* v. *Hunter,* 336 U. S. 684 (1949), was clearly such a case.  So were the cases that the majority says involved situations where "an impartial verdict cannot be reached," *ante,* at 464.  In those cases, a juror or the jury as a whole, uncontrolled by the judge or prosecutor, prevented the trial from proceeding to a verdict.  *United States* v. *Perez,* 9 Wheat. 579 (1824); *Simmons* v. *United States,* 142 U. S. 148 (1891); *Thompson* v. *United States,* 155 U. S. 271 (1894).