922 F.2d 842
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Herman Pete SIMPSON, III, Defendant-Appellant.
 No. 90-5982.
 United States Court of Appeals, Sixth Circuit.
 Jan. 10, 1991.
 
 Before MERRITT, Chief Circuit Judge, and NATHANIEL R. JONES and WELLFORD, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant Herman Pete Simpson appeals the district court's interlocutory order denying his motion to dismiss the indictment against him asserting that retrial would violate his fifth amendment rights under the double jeopardy clause. For the reasons set forth below, we affirm.
 
 I.
 
 2
 On March 7, 1990, a federal grand jury indicted Simpson and four other defendants on one count of conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. Sec. 846. The United States proceeded to trial against three of the defendants--Simpson, Lionel Fleming, and Sidney Ware on May 29, 1990. On the second day of trial, Captain Gary Lusher testified that he found co-defendant Sidney Ware's business card in defendant Simpson's pocket at the time of the arrest. The prosecution showed the card to the defendants and then moved that it be admitted as evidence. When the court asked if there were any objections, Simpson's counsel, Mr. McCall, said he might have one and asked to reserve his objection until after cross-examination of Captain Lusher. After cross, McCall asked to see an inventory report of the evidence taken from Simpson's wallet. The government acknowledged that there was an inconsistency between the testimony and the DEA 6 report which indicated that the business card had come from the wallet of Mr. Fleming. The trial judge then called a hearing in chambers.
 
 
 3
 As the hearing progressed, it was revealed that the government had only provided a photocopy of one side of the business card to defendants in discovery. On the other side of the card, there was a notation indicating that it had been found in Simpson's pocket. According to the DEA 6 report, which had also been produced in the government's discovery, the card had been found in Fleming's wallet. Thus, none of the defense attorneys were aware that the card had been found on Simpson instead of Fleming. This information caused quite a stir because both Simpson's and Ware's defenses were based upon their ability to show that they did not know each other and thus could not have conspired. The fact that Ware's business card was in Simpson's pocket strongly suggested that the defendants knew each other prior to the time of arrest.
 
 
 4
 McCall demanded to see the official inventory to determine whether the card was from Fleming or from his client, Simpson. Investigation revealed that there had in fact been two business cards, one found on Fleming and one found on Simpson. Somehow the second card had been overlooked and the information was not properly provided to defense counsel in discovery. All parties agreed that there was no evidence of bad faith. J.App. at 86-87.
 
 
 5
 At several points in the hearing counsel for Ware, Mr. Broderick, made a motion for a mistrial because his entire case focused upon a lack of evidence of a connection between Simpson and Ware. Had the card been found in Fleming's pocket, as he had originally thought, he could have explained it because Fleming and Ware went to college together. However, now that it was clear there were two business cards, one found on Simpson and one on Fleming, a complete link was established between all three defendants, and Broderick explained he was unprepared to defend. Id. at 76-78. Later in the hearing he added that he had made statements in his opening based upon his thought that there was no link between his client and Simpson. Now that it appeared there was link, it would be unfair to continue because his opening would conflict with the evidence of the second card. Id. at 82.
 
 
 6
 Mr. Chambers, counsel for Fleming, added that the fact that since this was conspiracy prosecution which was based upon establishing a connection between the defendants, the business card evidence was of paramount importance. The fact that the full impact of both the cards was not recognized by the defense due to lack of proper pretrial discovery by the prosecution, even without fault, made a mistrial necessary. Id. at 80-81.
 
 
 7
 Mr. McCall did not join in the motion for a mistrial, although he shared the view of his co-defense counsel with respect to the fairness of the proceeding. In response to the government's assertion that it could have put on testimony about the cards even if the cards had not been produced, McCall stated:
 
 
 8
 That's not what you all believed going into this, nor is it what we believed. I relied on the fact that it was Lionel Fleming's card. I never said in my opening statement to the jury about having this card on my man. I almost fell over when he [counsel for the United States] said my man had it [in his opening statement]. I thought he had made a terrible error. I've made a fool out of myself in front of this jury with this last witness [Captain Lusher] up here. We can suppress the card or we can now say Roberta Raffa [the woman who made the DEA 6] did make a mistake in her thing because there was two cards involved. But any way it goes, I'm out in the cold here right now because you all have got a card introduced against my client, or tendered and been read to the jury and it's got his name on it [written on the back] that's not in any document here or at least not in the documents that you all furnished us and the inventory--typed inventory we have seen today.
 
 
 9
 Id. at 84-85. Mr. McCall goes on to state:
 
 
 10
 I'm left without even a mistake argument. They thought they made a mistake. Now, if we go back out there, we can't even say they made a mistake. The jury is going to be hot at me about getting on Captain Lusher on this thing. I'm up there in his face with a card that I think I have got the world by the tail on.
 
 
 11
 Id. at 87.
 
 
 12
 Throughout the hearing the government argued that a mistrial was not necessary. In fact, the government even went so far as to assert that the second card would help Ware's case because he could say that he always gives out business cards to new acquaintances. Id. at 80. The government also argued that the evidence was not prejudicial because it could have been introduced by testimony even without actually introducing the cards. Id. at 84-85.
 
 
 13
 The court rejected the government's attempts to save the trial. As the court put it:
 
 
 14
 What has happened is that this card has been introduced which at least shoots a pretty big hole in Mr. Broderick's offense and Mr. McCall's defense because they went in with the mistaken impression that that card that's been introduced into evidence was found in Fleming's pocket and not in Simpson's pocket. Then for the first time Mr. McCall learns when Lusher testifies that he took that card out of Simpson's pocket and that somebody wrote on the back that came out of Simpson's pocket. He learns that for the first time in the trial. The card I'll admit was presented before it was introduced, but if I remember, it was just a flash around the room and then take it over starting up with it.
 
 
 15
 Id. at 86. However, the court decided to think about the potential mistrial overnight before making a decision.
 
 
 16
 On the record the next morning the court announced that it had decided to grant the mistrial:
 
 
 17
 Let the record show that after deliberation the court has declared a mistrial based on the inability of defendants to adequately prepare their defense and the surprise that occurred when the card of the defendant Ware was found not only on the person of defendant Simpson, but also in the wallet of the defendant Fleming.
 
 
 18
 Id. at 90.
 
 
 19
 At this point, McCall asked the court not to grant the mistrial. He argued that while a mistrial was appropriate for Fleming and Ware, and while he might be entitled to a mistrial as well, he thought that the trial was going well and that the errors could be cured. Id. The court refused to allow the trial to continue only with defendant Simpson. This timely appeal followed.
 
 II.
 
 20
 A trial judge may order a mistrial after jeopardy has attached without running afoul of the defendant's rights under the double jeopardy clause of the fifth amendment if he or she finds that such a mistrial is a "manifest necessity" to ensure the fairness and integrity of the proceeding. United States v. Perez, 22 U.S. (9 Wheat.) 579, 580 (1824). The level of scrutiny afforded a trial judge's finding of "manifest necessity" depends on the nature of the facts and circumstances:
 
 
 21
 [T]hose words do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge. Indeed, it is manifest that the key word "necessity" cannot be interpreted literally; instead, contrary to the teachings of Webster, we assume that there are degrees of necessity and we require a "high degree" before concluding that a mistrial is appropriate.
 
 
 22
 Arizona v. Washington, 434 U.S. 497, 506 (1978). This court takes a deferential posture to the determinations of trial judges with respect to mistrials. See United States v. Sisk, 629 F.2d 1174, 1178 (6th Cir.1980), cert. denied, 449 U.S. 1084 (1981) (ordinarily great deference given to the trial judge's determination of necessity for mistrial). As this court has put it, "The sole limitation on the authority of the court to determine that a mistrial is 'manifestly necessary' is that the judge must exercise his 'sound discretion' in determining that the ends of public justice would not be served by a continuation of the proceedings." United States v. Larry, 536 F.2d 1149, 1153 (6th Cir.), cert. denied, 429 U.S. 984 (1976) (citing United States v. Jorn, 400 U.S. 470, 481 (1971)) (other citations omitted)).
 
 
 23
 Simpson does not dispute that his double jeopardy claim is dependent on a finding that a mistrial in this case was not "manifestly necessary." He asserts two related reasons why this court should reverse the trial judge's finding of "manifest necessity" in this case. The first is that the trial judge did not give " 'adequate consideration to the existence of any less drastic alternative[s]' " to the mistrial. United States v. Ramirez, 884 F.2d 1524, 1529 (1st Cir.1989) (citation omitted). The second is that the court did not adequately consider the possibility of severing Simpson's trial from the others. United States v. Bridewell, 664 F.2d 1050, 1051 (6th Cir.1981) (mere fact that two trials would be required is not enough to create manifest necessity for mistrial).
 
 
 24
 Simpson asserts that the court should have considered the possibility of suppressing the evidence of the two cards or admonishing the jury as to the mistakes made by the prosecution before granting a mistrial. However, the record suggests that both of these possibilities were considered by the court. First, the government suggested at several times during the hearing that it would proceed by only producing one card and not both. However, the court suggested that this would not take care of the surprise to defendants' counsel at learning that the card introduced was found on Simpson rather than Fleming. As the court put it:
 
 
 25
 What has happened is that this card has been introduced which at least shoots a pretty big hole in Mr. Broderick's offense and Mr. McCall's defense because they went in with the mistaken impression that that card that's been introduced into evidence was found in Fleming's pocket and not in Simpson's pocket.
 
 
 26
 J.App. at 86. Further, all three defense attorneys argued that they had been prejudiced by the testimony which had already been introduced. Both McCall and Broderick stated that they would have made different opening statements had they known about the existence of the card tying Ware to Simpson. In addition, McCall suggested the day before the court's ruling that he would not even be able to argue that there had been a mistake because he had already "made a fool of himself" in front of the jury.
 
 
 27
 In addition, defense counsel strongly asserted that McCall's severe cross-examination of Captain Lusher was not the only error at trial which resulted from the mistake about the cards. Rather, the mistake went to the core of the defense against the conspiracy charge. As McCall put it,
 
 
 28
 I've made a fool of myself in front of the jury with this last witness up here [Captain Lusher]. We can suppress the card or we can now say Roberta Raffa did make a mistake in her thing [the DEA 6] because there was two cards involved. But any way it goes, I'm out in the cold here right now because you all have a card introduced against my client ... and it's got his name on it....
 
 
 29
 Id. at 85. Thus, it would seem that the trial judge had ample evidence before him to conclude that suppression of the card or admonition of the jury would not alleviate the prejudice to the whole proceeding which resulted from the mix-up over the business cards.
 
 
 30
 Simpson's related contention is that the court did not adequately consider the question of allowing the trial to continue only as to him, while granting a mistrial as to the other defendants. Simpson relies on Bridewell which held that the mere fact that two trials might be necessary did not provide manifest necessity to grant a mistrial as to all the defendants, when the mistrial was opposed by some defendants. 664 F.2d at 1051. However, Simpson's reliance on Bridewell is misplaced. In Bridewell, the trial judge all but conceded that a mistrial was not manifestly necessary when he admitted that if the problematic discovery regarding two of the jurors had come later in the trial, he would have let the trial proceed. Id. In the instant case, given the trial court's determination that the whole process had been distorted by the defense's lack of knowledge about the two cards and the testimony already introduced, it was faced with more than "the [mere] possibility of two trials." Id.
 
 
 31
 Simpson also relies on the First Circuit's decision in Ramirez to support his position. In Ramirez, the district court granted a mistrial because the jury had been selected from a venire which was not randomly selected in conformity with the Jury Act. 884 F.2d at 1527. The First Circuit reversed, in part, because the district court had not provided counsel with an opportunity to object or to propose alternatives to a mistrial prior to excusing the jury. In fact, the district court did not even hold a hearing on the mistrial until a week after the jury had been excused.
 
 
 32
 In the instant case, the trial judge held an extensive hearing on the effects and repercussions of the evidentiary errors resulting from the discovery of the two separate cards. He also took a night to deliberate over the question of whether a mistrial was necessary. Further, McCall was given an opportunity to object to the mistrial and propose severance even after the mistrial was granted but before the jury was excused. The judge refused that objection. Indeed, had the court allowed the trial to continue for Simpson alone and had Simpson been convicted, he could have sought reversal based upon the surprise at trial created by the existence of the two cards. "[W]here the declaration of a mistrial implements a reasonable state policy and aborts a proceeding that at best would have produced a verdict that could have been upset at will by one of the parties, the defendant's interest in proceeding to verdict is outweighed by the competing and equally legitimate demand for public justice." Illinois v. Sommerville, 410 U.S. 458, 471 (1973).
 
 IV.
 
 33
 While this seems to us a close case, we think the trial judge exercised the requisite "sound discretion" in determining that a mistrial was "manifestly necessary." Thus, we AFFIRM.