# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Tommy Lee Benton, Petitioner.

Appellate Case No. 2021-001498

―――――――――

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

―――――――――

Appeal From Horry County
Steven H. John, Circuit Court Judge

―――――――――

Opinion No. 28185
Heard June 7, 2023 – Filed January 17, 2024

―――――――――

## AFFIRMED AS MODIFIED

―――――――――

Robert Walker Humphrey, II, of Willoughby Humphrey & D'Antoni, P.A., of Charleston, and Chief Appellate Defender Robert Michael Dudek, of Columbia, both for Petitioner.

Solicitor Jimmy A. Richardson, II, of Conway; Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Assistant Attorney General Tommy Evans, Jr., all of Columbia, all for Respondent.

**JUSTICE HILL:** Tommy Lee Benton was indicted for murder and other violent offenses. His first trial ended in a mistrial after the jury had been sworn and heard opening arguments but before any evidence was presented. At his retrial, a jury convicted Benton of the murder of Charles Bryant Smith (Victim), as well as two counts of first-degree burglary, one count of first-degree arson, and one count of third-degree arson. The court of appeals affirmed his convictions. *State v. Benton*, 435 S.C. 250, 865 S.E.2d 919 (Ct. App. 2021). We granted Benton's petition for a writ of certiorari to review the court of appeals' decision that: (1) his first trial was not improvidently declared a mistrial and, thus, his second trial and ensuing convictions were not barred by double jeopardy; (2) the trial court did not err in admitting several disturbing photographs of Victim's body from the crime scene; and (3) the trial court did not err in admitting certain text and Facebook messages.

## I.   Factual and Procedural Background

The opinion of the court of appeals sets forth the pertinent facts. In sum, this case involves a depraved plot by Benton, Michael Cheatham, and several others to rob and kill Victim, a well-known store owner in Aynor. Benton and his cohorts targeted Victim, believing he stored large amounts of cash at his store and home. They first burgled Victim's home, stealing some $27,000. They next broke into his store and, finding neither cash nor the Victim, burned the store down. Finally, a few days later, they returned to Victim's home. The evidence demonstrated they tied Victim to a chair and handcuffed him, Benton beat him with a crowbar, poured gasoline on Victim and around his home, set the home on fire, and fled. Law enforcement discovered Victim's charred, handcuffed body in the chair. The autopsy concluded Victim died of carbon monoxide poisoning, meaning he was burned alive.

During opening arguments at Benton's first trial, Benton asserted his great-grandmother would be testifying that, on the night of Victim's murder, Benton was with her in North Carolina. The State objected, contending Benton should be precluded from offering his alibi evidence at trial because he had never responded to the State's Rule 5(e), SCRCrimP request for disclosure of alibi. After Benton conceded he had not responded to the alibi disclosure request, the trial court gave him and the State the opportunity to be further heard, in essence an open invitation for both sides to explain their perspectives on the harm caused by Benton's failure to disclose. Ultimately, the trial court *sua sponte* declared a mistrial, reasoning it was:

> faced with the situation that if [it] impose[s] the strictures
> or the sanctions that are set forth in Rule 5, it would

> deprive the defendant basically of his defense to these crimes and the most probable consequence of that would be that there would be a less than complete factual presentation of the case to the jury and they would base their decision on a less than complete factual basis.

The trial court went on to explain that, if it decided not to exclude Benton's undisclosed witnesses, the State would not have a full and fair opportunity to challenge Benton's alibi or present evidence disputing it. The trial court ruled:

> I have no choice but to declare a mistrial in this matter. I do find there is manifest necessity in doing so based upon the reasons that I have said. The harm that it would do to the defendant, the harm that it would do the State, I find there is no other reasonable conclusion that can be had in this matter because of that.

The trial court later reaffirmed its finding of manifest necessity in a written order.

Before Benton's retrial began, Benton moved to have the charges against him dismissed as barred by double jeopardy, asserting the trial court had improvidently declared his first trial a mistrial. The motion was denied.

## II.   Standard of Review

Our review extends only to corrections of errors of law. *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). We review a trial court's mistrial decision for abuse of discretion. *Renico v. Lett*, 559 U.S. 766, 774 (2010). A mistrial should be declared cautiously and only in the most urgent circumstances for plain and obvious reasons. *Id*. We review evidentiary rulings for abuse of discretion. *State v. Wise*, 359 S.C. 14, 21, 596 S.E.2d 475, 478 (2004).

## III.   Double Jeopardy

We affirm as modified the court of appeals' decision that there was no double jeopardy violation. When a defendant's first trial ends in a mistrial, the double jeopardy clause bars a second prosecution unless the mistrial was declared due to "manifest necessity," that is a "high degree" of necessity to further the ends of justice and preserve public confidence in fair trials. *Renico*, 559 U.S. at 774–75; *Illinois v. Somerville*, 410 U.S. 458, 468 (1973). Like the court of appeals, we conclude the trial court exercised sound discretion in declaring a mistrial in Benton's first trial. The trial court conscientiously considered alternatives to the drastic remedy of

declaring a mistrial. *Cf. United States v. Jorn*, 400 U.S. 470, 487 (1971) (holding a trial court abused its discretion in declaring a mistrial when it did so without allowing either party to object or request a continuance); *see also Arizona v. Washington*, 434 U.S. 497, 506 (1978) (explaining the "manifest necessity" test cannot be applied "mechanically or without attention to the particular problem confronting the trial [court]"). There may have been some space for the trial court to have recessed the trial so the State could conduct a due diligence investigation of Benton's alibi disclosure, but given the skimpy record before us, we cannot say so without speculating. The transcript states an "off the record" conference occurred before the trial court's ruling. The trial court should have held or memorialized these discussions on the record, a point we will discuss more fully in the next section of this opinion. Still, we agree with the court of appeals that the trial court otherwise well navigated the issue. Benton and the solicitor shared fault perhaps for the circumstances and apparent misunderstandings that led to the mistrial. *Cf. Oregon v. Kennedy*, 456 U.S. 667, 676 (1982) (stating there can be no manifest necessity to declare a mistrial when the prosecutor intentionally goads the defendant into moving for one). The trial court gave both the solicitor and Benton's skilled trial counsel the opportunity to be heard and offer comments. Neither Benton nor the State objected to the trial court's analysis or its declaration of a mistrial.

The only quibble we have with the court of appeals' double jeopardy analysis is its discussion that Benton suffered no prejudice from the mistrial because he was allowed to present his alibi witnesses at his retrial. The constitutional guarantee against double jeopardy protects defendants from the dread, anxiety, and financial cost of enduring the gauntlet of criminal prosecution and punishment more than once for the same offense. *See Arizona*, 434 U.S. at 503–05 (explaining the double jeopardy clause protects "the defendant's 'valued right to have his trial completed by a particular tribunal'" and this right is valued because "a second prosecution . . . increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted" (citations removed)). The defendant's interest in having his fate determined by the first impaneled jury is therefore "a weighty one." *Somerville*, 410 U.S. at 471. As such, "the lack of apparent harm to the defendant from the declaration of a mistrial [does] not itself justify the mistrial[.]" *Id*. at 469. Further, in *Jorn*, a plurality of the Supreme Court noted inquiries into who benefits from a mistrial are "pure speculation." 400 U.S. at 483. Therefore, the *Jorn* plurality concluded that to allow a retrial "based on an appellate court's assessment of which side benefited from the mistrial ruling does not adequately satisfy the policies underpinning the double jeopardy provision." *Id*.

Here, the trial court focused, as it should have, on whether, given all the circumstances, a mistrial was necessary to further the ends of public justice. *See United States v. Perez*, 22 U.S. 579, 580 (1824) (stating a mistrial may be granted without violating double jeopardy when, in the sound discretion of the court, "taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated"); *Gori v. United States*, 367 U.S. 364, 368 (1961) ("Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection . . . ."). The trial court wisely understood that not granting a mistrial under the circumstances could undermine public confidence in the outcome. *See Wade v. Hunter*, 336 U.S. 684, 689 (1949) ("[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgements."). We therefore vacate the court of appeals' prejudice discussion but otherwise affirm its double jeopardy ruling.

## IV.   Admissibility of Crime Scene Photographs

Next, we agree with the court of appeals that the trial court did not abuse its discretion in admitting the graphic crime scene photographs of Victim's burned body. (State's Ex. 54-55). It is inescapable that the photographs were gruesome and revolting. We have long warned the State not to overplay its hand in criminal trials by seeking to admit shockingly graphic photographs that have scant probative value in violation of Rule 403, SCRE, just to inflame the passions of the jury. We recently reversed a conviction the State had secured by doing just such a thing. *See State v. Nelson*, Op. No. 28171 (S.C. Sup. Ct. filed Aug. 9, 2023) (Howard Adv. Sh. No. 31 at 25) (reversing murder conviction due to the prejudice caused by erroneous admission of gruesome autopsy photographs).

This case differs from *Nelson* in several ways. The photographs at issue in *Nelson* were autopsy pictures of the victim's decomposing and disfigured body. *Id.* at 28–29. They could corroborate nothing but the prosecutor's overreach. *Id.* at 35. By contrast, the pictures here were relevant as they depicted the crime scene. They drew probative force from their unique power to make Benton's accomplices' testimony more believable. The pictures gave important context to the testimony and other evidence about who did what at the scene. Under the specific circumstances of this case, the pictures assisted the jury in their task to understand other key evidence.

In our review of the trial court's admission of the photographs, we note the trial court again did not place its Rule 403 analysis on the record. Instead, after an off-the-

record bench conference, the trial court simply admitted the three photographs, commenting they were a "proper representation of the scene." As we have expressed in the past, "we stress the importance of placing on the record arguments and rulings that took place off the record, whether during a bench conference, in emails, or in chambers." *State v. Washington*, 431 S.C. 394, 405 n.4, 848 S.E.2d 779, 785 n.4 (2020). We emphasize that on-the-record arguments and rulings enable judicial review and allow the parties and the public to better understand the rulings.

At any rate, any error during the process of admitting the pictures was harmless, as their introduction did not affect the result of the trial. *See State v. Byers*, 392 S.C. 438, 447, 710 S.E.2d 55, 60 (2011) ("Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result." (quoting *State v. Pagan*, 369 S.C. 201, 212, 631 S.E.2d 262, 267 (2006))); *id*. ("Where 'guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached,' an insubstantial error that does not affect the result of the trial is considered harmless." (quoting *Pagan*, 369 S.C. at 212, 631 S.E.2d at 267)). The record is loaded with compelling evidence incriminating Benton of each of the crimes in this violent spree. We conclude the photographs did not contribute to the verdict in any significant way.

### V. Admissibility of Text and Facebook Messages

We affirm the decision of the court of appeals affirming the admission of the text and social media messages.

**AFFIRMED AS MODIFIED.**

**BEATTY, C.J., KITTREDGE and JAMES, JJ., concur. FEW, J., concurring in a separate opinion.**

**JUSTICE FEW:** I concur with the majority's ruling on the admissibility of the autopsy photographs. The record supports the trial court's determination the photos had enough probative value to survive Benton's Rule 403 challenge and, thus, the trial court's decision to allow them into evidence was within its discretion.

As to the mistrial issue, however, the majority stretches itself too far to say the trial court acted "wisely" and "conscientiously." In my view, the trial court acted rashly. The majority points out the trial court's two errors.

First, the trial court did not consider whether a short recess in the trial could have given the State time to respond to the late-disclosed alibi witness. As the majority under-states, "There may have been some space for the trial court to have recessed the trial so the State could conduct a due diligence investigation of Benton's alibi disclosure." Absolutely, the trial court should have paused, reflected, and listened. The trial court's failure to do this—by itself—was error.

Second, the trial court appears to have conducted an off-the-record discussion of Benton's late-disclosed alibi witness. As the majority states, "The trial court should have held or memorialized these discussions on the record." This failure also was error.

The majority nevertheless justifies the trial court's impatience by rationalizing—incorrectly in my view—"the trial court gave [Benton] and the State the opportunity . . . to explain their perspectives on the harm caused by Benton's failure to disclose." The record does not indicate the trial court gave the parties such an opportunity. If it were true the trial court did that, my position would be different. But this event did not occur on the record, and we have no idea what occurred in the proceedings the trial judge conducted off the record in his office.

Ultimately, however, on the unique facts of this case, the trial court's decision to grant a mistrial does not prevent a retrial under the Double Jeopardy Clause because Benton brought this on himself by failing to disclose the alibi witness as our Rules plainly require. Thus, as to the mistrial issue, I concur with the majority only in result.