Lawrence ROUTH, Appellant,

v.

UNITED STATES, Appellee.

No. 82–1181.

District of Columbia Court of Appeals.

Argued Nov. 8, 1983.

Decided Oct. 2, 1984.

Melvin M. Dildine, Washington, D.C., appointed by the court, for appellant.

John F. Stevens, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Michael W. Farrell, Judith Hetherton, and Robert F. O'Neill, Asst. U.S. Attys., Washington, D.C., were on brief for appellee.

Before BELSON, Associate Judge, and PAIR and KERN,* Associate Judges, Retired.

BELSON, Associate Judge:

The question on this appeal is whether double jeopardy prohibits the retrial of appellant, whose first trial was declared a mistrial when a government witness became unavailable because of illness. We hold that under the circumstances retrial is prohibited, and accordingly reverse the trial court's denial of appellant's motion to dismiss the indictment.

---

* Judge Kern was an Associate Judge at the time of argument. His status changed to Associate Judge, Retired, on May 25, 1984.

Appellant was charged with assault with intent to kill while armed, D.C.Code §§ 22–501, –3202 (1981 & Supp.1984), carrying a pistol without a license, *id.* § 22–3204, and destroying property, *id.* § 22–403, in connection with the shooting on February 20, 1981, of Thomas Massey. The case came on for trial on May 4, 1982, a jury was sworn, and trial began.

In his opening statement the prosecutor told the jury that the evidence would show that during a fight on February 19, 1981, Massey had struck appellant several times with a pipe. In revenge, the prosecutor said, appellant came up to Massey the next morning as Massey was warming up his car and shot him at point-blank range. Massey, who survived the attack, would be the only witness who was present at the shooting. There would be other witnesses, the prosecutor said, including a police crime scene technician who would introduce photographs of Massey's car showing that a window was blown out and showing a rip in the headrest.

Defense counsel, in his opening statement, specifically disclaimed reliance on a self-defense theory. Rather, he said, "Our defense is my client didn't do it." The defense would present a number of witnesses who would testify that appellant was at home at the time the shooting occurred, he added. Nowhere in his statement did defense counsel dispute that Massey had been shot.

By the time opening statements were completed, only a short time remained in the trial day for the presentation of testimony. The prosecutor said that he could have put on a crime scene search officer, who would have been "a very short witness," but that the officer had had to leave. Rather than begin the testimony of the complaining witness, Massey, the trial court adjourned the proceedings for the day.

The next morning the prosecutor alerted the court and defense counsel that the crime scene technician had been recently diagnosed as having epilepsy, and that the medication he was taking for his condition might affect his thinking and his speech. He said that he did not intend to bring this out before the jury unless it became obvious the officer was having difficulty.

The government then presented complainant Massey as its first witness. Massey testified that he had had casual contact with appellant at his government job for 7 or 8 years. He described the fight mentioned in the prosecutor's opening statement, contending that appellant had punched him several times, and that only then had he struck appellant with a pipe. The pipe for the previous 2 or 3 years had been in the government vehicle that Massey drove; Massey did not know what it was doing there, he said.

The next morning, Massey testified, as he was warming up his car he saw a shadow and turned to see who it was. He saw appellant, who walked up to the car from the side and took a gun out of his pocket. According to Massey, appellant said, "I told you it wasn't over with," and began firing. Massey tried to duck the shots, but was hit. He remembered hearing 4 or 5 shots, he said.

Without defense objection, Massey then removed his upper garments and showed the jury 5 or 6 places where bullets had either entered or exited his body. Massey also identified a shirt and jacket he had been wearing that morning, and pointed out the holes caused by the bullets.

Massey also identified two photographs showing the damage to his car: the driver's window had been shot out and there was a scratch mark on the driver's headrest. The car had been undamaged before the shooting, Massey said. Finally, Massey affirmed that he was sure the man who shot him was appellant.

On cross-examination, Massey admitted that he had previously been convicted of carrying a dangerous weapon—a pipe—that he had put in his own car. He also admitted that he had been terminated from his government job but said that the mat-

ter was on appeal. Defense counsel then impeached Massey with a prior statement he had given in the administrative termination proceeding concerning whether he saw who shot him. The prosecutor protested vociferously that the impeachment was improper because the statement was consistent with what Massey had said on direct.

While this matter was being discussed at the bench, defense counsel's investigator came in with a pipe, which defense counsel then carried through the courtroom in view of the jury. The prosecutor objected, but out of the jury's presence Massey identified it as the pipe with which he had hit appellant. At that point the proceedings were recessed for lunch.

The trial was never resumed, however. Immediately after lunch the prosecutor reported that the crime scene technician had been placed on leave under doctor's orders. The doctor had explicitly forbidden the technician to testify in court. Moreover, the doctor had indicated that it would be months before he would be able to testify.

When defense counsel declined to stipulate to the admission of photographs, bullets and shell casings that the technician would have introduced, and to the location at which the bullets and casings were found, the prosecutor moved for a mistrial. The prosecutor maintained that there was no other witness or witnesses through whom this "essential evidence" could be introduced.

Defense counsel "strenuously" objected to the granting of a mistrial. He argued that the photographs could probably be admitted through other witnesses and that the location of the shell casings and bullets was irrelevant since the defendant was not contesting that a shooting had occurred.

After listening to the parties' arguments, the court declared,

> Gentlemen, I think under all these circumstances, in order to be as fair as possible to every side in this case, I'm going to grant the government's request for a mistrial.... [I]f it appears after a matter of, say, several months, that this witness isn't going to be any better able to supply this information, then I think we're going to have to consider throwing the case out.

At the prosecutor's request, the trial judge added that he was granting the mistrial "[f]or manifest necessity." However, the trial judge did not state why he concluded that the technician's testimony was essential to the government's case.

■ Appellant subsequently filed a motion to dismiss the indictment, arguing, as he had at trial, that there was no manifest necessity for declaring a mistrial because the crime scene technician was not essential to the government's case. The trial court denied the motion without hearing on the ground that appellant had not set forth any new reasons for opposing the mistrial. Appellant then noted this interlocutory appeal.[1]

The general principles that guide our decision are well-established and may be summarized briefly. The Fifth Amendment prohibits an accused from being "twice put in jeopardy of life or limb" for the same offense. "The underlying idea," the Supreme Court has said,

> is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199 (1957) (quoted in *Arizona v. Washington,* 434 U.S. 497, 504 n. 13, 98 S.Ct. 824, 829 n. 13, 54 L.Ed.2d 717 (1978)). As a general

---

**1.** The trial court's order is appealable. *See Abney v. United States,* 431 U.S. 651, 662, 97 S.Ct. 2034, 2041, 52 L.Ed.2d 651 (1977); *Merriweather v. United States,* 466 A.2d 853, 854 & n. 1 (D.C.1983).

rule, therefore, "the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Arizona v. Washington, supra,* 434 U.S. at 505, 98 S.Ct. at 830.

■ Once the jury is selected and sworn, jeopardy "attaches." *Illinois v. Somerville,* 410 U.S. 458, 466–67, 93 S.Ct. 1066, 1071–72, 35 L.Ed.2d 425 (1973); *Coleman v. United States,* 449 A.2d 327, 328 (D.C.1982). At that point, a defendant has a "valued right to have his trial completed by a particular tribunal." *Arizona v. Washington, supra,* 434 U.S. at 503 & n. 11, 98 S.Ct. at 829 & n. 11; *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949); *Coleman, supra,* 449 A.2d at 328. That right "is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Arizona v. Washington, supra,* 434 U.S. at 505, 98 S.Ct. at 830.[2] However, in view of the importance of the right and the fact that it is frustrated by any mistrial, the government bears the burden of demonstrating "manifest necessity" for any mistrial declared over the objection of the defendant. *Id.* at 505, 98 S.Ct. at 830. Absolute necessity is not required, but a "high degree" of necessity must be shown, sufficient to override the defendant's interest in having his fate determined by the jury. *Id.* at 506, 98 S.Ct. at 830, and *Illinois v. Somerville, supra,* 410 U.S. at 471, 93 S.Ct. at 1073.

■ Thus, whether appellant may be retried depends on whether there was manifest necessity for the granting of a mistrial. The trial court, of course, makes this determination in the first instance. In the fountainhead case of *United States v. Perez,* 9 Wheat. 579, 580, 6 L.Ed. 165 (1824), Justice Story said that the court is to exercise "a sound discretion" in making this determination. This has been interpreted

to mean that the trial court's finding of manifest necessity may be reversed only for an abuse of discretion. *See Illinois v. Somerville, supra,* 410 U.S. at 468, 93 S.Ct. at 1072; *United States v. Jorn,* 400 U.S. 470, 481–83, 91 S.Ct. 547, 555–56, 27 L.Ed.2d 543 (1971) (plurality opinion); *Wade v. Hunter, supra,* 336 U.S. at 692, 69 S.Ct. at 838; *Braxton v. United States,* 395 A.2d 759, 769, 773 (D.C.1978).

■ More recently, the Supreme Court has said that the kinds of trial problems that may warrant a mistrial "vary in their amenability to appellate scrutiny." *Arizona v. Washington, supra,* 434 U.S. at 510, 98 S.Ct. at 832; *accord Coleman v. United States, supra,* 449 A.2d at 329. For example, a trial judge's decision to declare a mistrial when he considers the jury deadlocked is accorded great deference because he is in the best position to assess whether the jury will be able to reach a just verdict if it continues to deliberate. *Arizona v. Washington, supra,* 434 U.S. at 509–10 & n. 28, 98 S.Ct. at 832–33 & n. 28. Likewise, a decision to grant a mistrial on the ground that the jury's impartiality has been affected by improper comments by counsel is entitled to special respect. *Id.* at 510–11, 98 S.Ct. at 832–33.

■ At the other extreme, the Court has said, "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." *Id.* at 508, 98 S.Ct. at 831 (footnotes omitted). *Accord Coleman v. United States, supra,* 449 A.2d at 329.

In this case, the basis for the mistrial was the unavailability of a government witness, so we apply the "strictest scrutiny."

---

2. For an explanation of why a rigid application of the "particular tribunal" principle is unacceptable, see Justice Harlan's plurality opinion in *United States v. Jorn,* 400 U.S. 470, 479–80, 91

S.Ct. 547, 554–55, 27 L.Ed.2d 543 (1971) (cited with approval in *Arizona v. Washington, supra,* 434 U.S. at 505 n. 16, 98 S.Ct. at 830 n. 16).

The Supreme Court has refused to say that the absence of witnesses can never justify discontinuance of a trial. *Downum v. United States,* 372 U.S. 734, 737, 83 S.Ct. 1033, 1035, 10 L.Ed.2d 100 (1963); *Wade v. Hunter, supra,* 336 U.S. at 691, 69 S.Ct. at 838. For example, in *Wade v. Hunter,* the Court held that retrial was not barred where a mistrial was granted in a military court-martial during the invasion of Germany in early 1945. As the Army advanced, it moved beyond the vicinity of the alleged crime, making it impracticable to hear from certain witnesses. The facts of that case presented "extraordinary reasons" for deferring to the judgment of the Commanding General to discontinue the trial. *Id.* at 692, 69 S.Ct. at 838.

On the other hand, in *Downum, supra,* 372 U.S. at 734, 83 S.Ct. at 1033, the Court held that double jeopardy barred retrial where the prosecution allowed the jury to be sworn even though one of its key witnesses was absent and had not been found. *Id.* at 735, 83 S.Ct. at 1033. The Court stressed that "[e]ach case must turn on its facts." *Id.* at 737, 83 S.Ct. at 1035.

We do not consider this case controlled by *Downum* since here the witness was present and ready to testify when the jury was impaneled. Rather, the factor that compels our decision is that the government here failed to show that the missing witness' testimony was essential to its case.[3]

The government has not contended that the crime scene technician's testimony in any way would have linked appellant to the scene of the crime.[4] Instead, the government merely argues that with essentially a single eyewitness identification by the victim as the heart of its case, the critical issue for the prosecution was to show that Massey had a good opportunity to observe his assailant.[5] Thus, the government argues, "[e]vidence which would prove that the witness was correct about the number of shots fired, their angle and effect, even though he was their target, would provide a strong inference that he was accurate in his identification of the gunwielder as well." [6]

As to the first point about the number of shots, we note that Massey's demonstration to the jury of his bullet wounds corrob-

---

**3.** Appellant has not contended that the government's showing of unavailability was inadequate, so we accept for the purposes of this opinion that the witness was in fact unavailable. We note, however, that the report concerning the medical condition of the crime scene technician appears to have been double hearsay. The prosecutor reported to the court what he had heard from a police lieutenant, who in turn was reporting what the technician's doctor had said. *Compare Commonwealth v. Ferguson,* 446 Pa. 24, 29, 285 A.2d 189, 191 (1971) (mistrial based on illness of prosecution witness should not have been granted without definite diagnosis by the witness' physician), *with Hall v. Potoker,* 49 N.Y.2d 501, 507, 427 N.Y.S.2d 211, 215, 403 N.E.2d 1210, 1214 (1980) (in declaring mistrial based on illness of prosecution witness, trial court permitted to act on prosecutor's hearsay statement concerning witness' condition so long as it was reliable).

**4.** This would be a different case if, for example, the technician could have testified that he had recovered appellant's fingerprints from Massey's car, or that ballistics evidence would link appellant to the crime scene.

**5.** The government attempts to minimize the importance of the identification testimony of Kevin Dudley, who observed appellant for 20 seconds during the shooting. Dudley heard shots and looked out his bedroom window at appellant who was 45 feet away. The lighting was dim. When asked if he had doubts about the identification, Dudley described his certainty as "say 50/50." The court had suppressed Dudley's photo array and lineup identifications of appellant for reasons of marginal relevance here, but had denied suppression of Dudley's in-court identification. Dudley's testimony would have afforded some corroboration of the victim's identification.

**6.** The government also argues that the fact that appellant declined to stipulate to the absent officer's expected testimony suggests that the testimony was significant. While we agree with appellant's response that he was entitled to decline to do anything that might advance the government's case, appellant's refusal to stipulate has caused us to examine the officer's proffered testimony the more closely to see whether we should agree with the government that its loss provided an adequate basis for a mistrial.

orated his testimony that there had been 4 or 5 shots fired. Moreover, the government had available the testimony of a neighbor, Kevin Dudley, who had testified at a suppression hearing that he heard 5 or 6 shots. Thus, that part of Massey's testimony was strongly corroborated without the crime scene technician's testimony.

Next, as to the angle of the shots, we understand the government's strategy to have been to try to show that the shots were fired from in front of, or to the side of, Massey, rather than from behind, so as to show that Massey had an opportunity to view his assailant. However, the government did not proffer that the crime scene technician possessed the expertise necessary to testify to that effect. It appears, rather, that the prosecutor intended to introduce certain photographs taken by the technician that would show that the window on the driver's side had been shot out and that there was a rip in the headrest that could have been made by a bullet. The government concedes, however, that one or two of the photographs might have been admissible through the testimony of other police officers who responded to the scene of the shooting.

Also, with respect to the angle of the shots, it appears that the technician was to have testified that he recovered one shell casing inside the car by the driver's seat and other casings 2 feet and 14 feet to the rear and outside of the car, and that he found a bullet slug on the right rear floorboard. But it is not clear to us that the crime scene technician's testimony about the location of the bullets and shell casings would have improved materially the government's case on this point. Testimony that most of the shell casings were found 2 feet and 14 feet behind the car might have tended to disprove, rather than corroborate, Massey's testimony that his attacker approached from the side and fired at point-blank range. The government did not explain how the location of the casings tended to establish the di-rection from which the attacker approached the car.

The government urges that the facts of this case are similar to those in *United States ex rel. Gibson v. Ziegele*, 479 F.2d 773, 777 (3rd Cir.), *cert. denied*, 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973), in which the court upheld a finding of manifest necessity for the granting of a mistrial when a government witness became ill during the trial. However, in *Gibson* the missing witness was a police captain to whom the defendant had confessed the stabbing for which he was on trial. The court found that this confession could not have been admitted into evidence through any other witness and that, if believed, it would have been "the most important element in the prosecution's case." *Id.* The significance of the crime scene technician's testimony in the case before us does not compare to that of the police captain's testimony in *Gibson*.

We have become aware of two other cases in which, as in *Gibson*, a finding of manifest necessity for the granting of a mistrial was upheld where a prosecution witness unexpectedly became ill during trial. *See People v. Castro*, 657 P.2d 932, 941–43 (Colo.1983) (en banc) (in trial for attempted murder, the victim of, and a principal eyewitness to, the shooting which formed the basis of the charge); *Hall v. Potoker*, 49 N.Y.2d 501, 427 N.Y.S.2d 211, 403 N.E.2d 1210 (1980) (in trial for sale of controlled substance, the undercover police officer to whom the sale allegedly was made). In both of those cases, as in *Gibson*, the testimony of the unavailable witness was far more central to the prosecution's case than that of the crime scene technician in this case.

One other aspect of this appeal deserves mention. Based upon our review of the transcript, we think it is fair to observe that the case was not proceeding smoothly for the government at the time the prosecutor requested a mistrial. First, the prosecutor had apparently been surprised that appellant, using *Jencks* material, was able to locate the pipe Massey had used the day

before the shooting to strike appellant. His vigorous objection to its admission into evidence was overcome when Massey unhesitatingly identified the pipe as the one he had used in the fight.

Second, Massey made the damaging admission on cross-examination that he had previously been convicted of carrying a dangerous weapon—an iron pipe—which he had kept in his own car. The prosecutor had not known of this conviction and thought that Massey was confused; he thought that Massey had been stopped for a speeding violation, incident to which a pipe was found.

Third, the prosecutor demonstrated his concern that defense counsel had given the jury the impression that, as a result of an administrative hearing concerning Massey's altercation with appellant on the day preceding the shooting, Massey was fired from his government job. According to the prosecutor, the truth was almost exactly opposite. An initial inquiry had resulted in a recommendation to terminate, but, after a hearing, that decision was reversed. The trial court made a statement to the jury which, from our reading, would not have overcome the mistaken impression the prosecutor thought had been created.[7]

Finally, the prosecutor became noticeably upset when the trial court permitted defense counsel to impeach Massey with a prior statement that the prosecutor believed was not inconsistent with Massey's trial testimony.[8]

Appellant has not suggested that the prosecutor was guilty of bad faith in seeking a mistrial in this case, nor do we find in the record any evidence of wrongdoing. Nevertheless, we remain mindful of the Supreme Court's admonition in *Arizona v. Washington, supra,* 434 U.S. at 508, 98 S.Ct. at 831, that the "strictest scrutiny" is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence or "when there is reason to believe that the prosecutor is using the superior resources of the State ... to achieve a tactical advantage over the accused." (Footnote omitted.) Here, we think there is reason for concern that the prosecutor's decision to ask for a mistrial may have been influenced, even if only unconsciously, by the apparent setbacks to the government's case. Before a new trial he would have had an opportunity to clarify the nature of Massey's prior conviction and, generally, to devise a strategy to offset the impact of defense counsel's cross-examination. The course of the trial before the declaration of mistrial brings to mind the importance to appellant of "being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate," *Arizona v. Washington, supra,* 434 U.S. at 514, 98 S.Ct. at 834 (quoting *Jorn, supra,* 400 U.S. at 486, 91 S.Ct. at 557).

In sum, we conclude that this was a case in which the government failed to demonstrate a manifest necessity for a mistrial. The government offered no persuasive reasons why the crime scene technician's testimony was essential to its case. Having applied the strict scrutiny mandated where the basis for mistrial is the unavailability of critical prosecution evidence, *Arizona v. Washington, supra,* 434 U.S. at 508, 98 S.Ct. at 831, we are not satisfied that the trial judge here exercised "sound discretion" in declaring a mistrial. *See id.* at 514, 98 S.Ct. at 834. Accordingly, we held that the Double Jeopardy Clause prohibits appellant's retrial for the offenses with which he was charged in this case.

*Reversed.*

---

**7.** The transcript reveals that the prosecutor became rather agitated over the testimony. Twice the trial judge admonished the prosecutor not to shout at him. Finally, the judge said, "Sir, I can listen very carefully. You don't have to get [into] such a high state about it."

**8.** The trial judge interrupted the prosecutor's argument on this point to instruct him: "Sir, I'm going to ask you, please, to be calm when you're talking to me."

PAIR, Associate Judge, Retired, dissenting:

In my view, there was manifest necessity for the declaration of a mistrial in this case, engendered primarily by the public interest in a meaningful prosecution of this defendant charged with a serious crime. Consequently, I would hold that the trial court exercised sound discretion in declaring a mistrial since the crime scene technician's testimony was essential and relevant to matters at issue.

A mistrial without a bar to retrial may be declared without the consent of the defendant or even over his objection if "manifest necessity" exists or if the "ends of public justice" would otherwise be defeated. *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824); *Braxton v. United States,* 395 A.2d 759, 769 (D.C. 1978); *United States v. Bristol,* 325 A.2d 183, 186 (D.C.1974). Since it is virtually impossible to define all the circumstances in which it would be proper to discharge a jury, courts have been hesitant to fashion a rigid test to determine what circumstances will constitute "manifest necessity." As a result, trial courts have, as a general rule, balanced a defendant's recognized right to be free of successive prosecutions against the interest of society in the meaningful enforcement of the criminal law. *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

In accommodating the uneasy tension which necessarily exists between these conflicting considerations, a great deal of discretion must be vested in the trial judge, who is usually best situated to determine the degree of necessity for the declaration of a mistrial when an unexpected event occurs during a trial. *Illinois v. Somerville,* 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973); *Dunkerley v. Hogan,* 579 F.2d 141, 145 (2d Cir.1978), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979); *Coleman v. United States,* 449 A.2d 327, 328 (D.C.1982). For this reason, reviewing courts generally "accord the highest degree of respect to the trial judge's evaluation," *Arizona v. Washington,* 434 U.S. 497, 511, 98 S.Ct. 824, 833, 54 L.Ed.2d 717 (1978), and his decision has been disturbed on appeal only "in extreme circumstances threatening a miscarriage of justice." *Bliss v. United States,* 445 A.2d 625, 634 (D.C.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 756, 74 L.Ed.2d 972 (1983); *Middleton v. United States,* 401 A.2d 109, 127 (D.C.1979). Consequently, our review should be limited to determining whether the trial court, in the case at bar, abused its discretion in finding that the absence of a prosecution witness constituted a "manifest necessity" for the declaration of a mistrial.

Transcendent in the factual setting disclosed by this record is the public interest in bringing to trial this defendant who was alleged to have approached an automobile in which the complainant was seated in a defenseless position and who, upon questionable provocation, fired five or more bullets into complainant's body in an obvious attempt to take his life. My colleagues, in their effort to minimize the importance of the evidence lost through the absence of the crime scene technician, hold that since the government failed to demonstrate "manifest necessity," the Double Jeopardy Clause prohibits appellant's retrial. I cannot agree and conclude that the record amply supports a finding of "manifest necessity."

In order to sustain its burden of proof, the government was required to demonstrate beyond a reasonable doubt that defendant fired the bullets with intent to kill the complainant. In this respect, the angle from which the bullets were fired was crucial and any testimony to that effect would have been particularly relevant and critical to the government's case. Furthermore, the officer's testimony was necessary in order to authenticate certain crime scene photographs and to provide a proper foundation for their admission into evidence. From the record it appears, and the trial judge ruled, that no other witness could have provided this type of information.

Neither the complainant nor other police officers present at the scene had actually witnessed the absent officer take the photographs in question, nor were they able to verify the fact that the photographs accurately depicted the scene on the morning and at the time of the shooting. Thus, without the officer's testimony, it would have been impossible to adequately reconstruct the crime scene.

The absent witness was also to have offered testimony regarding the bullets and shell casings he personally recovered from and near complainant's car. This particular testimony was necessary to establish a chain of custody for the admission into evidence of the shell casings, bullets and photographs. Without such physical evidence, the government would not have been able to sufficiently link appellant to the crime other than through the testimony of the only eyewitness to the incident, the victim of the shooting.[1]

My colleagues assert that the admission of the bullets into evidence was only relevant to prove the number of shots which were fired and they insist that this fact had already been sufficiently proven by the complainant when he exhibited his gunshot wounds to the jury during the first day of

trial. In addition, they say that there was another witness who would have been available to testify regarding the number of shots he heard fired that morning. I do not perceive this evidence to be a legitimate substitute for the missing officer's testimony. First, there was no certainty that the wounds shown to the jury were in fact the same ones which the complainant sustained as a result of the shooting in question. Furthermore, testimony regarding the sounds which another witness perceived to be gunshots would have been particularly weak and of doubtful probative value.

But more than this, once the victim's credibility was attacked on cross-examination with a prior conviction and a prior inconsistent statement, the absent officer's testimony, which would have corroborated complainant's account of the shootings, became critical. The evidence collected by the officer would have provided the only significant corroboration of the victim's testimony, and without the crime scene technician's testimony, it would have been impossible to introduce this critical evidence.[2] Thus, I cannot agree that the trial court could not find from the totality of the circumstances that the crime scene technician was a key prosecution witness.[3]

1. The testimony of the complaining witness was that on February 19, 1981, he and appellant, a co-worker at the United States Government Printing Office, had an altercation at their workplace. During the course of the dispute, complainant struck appellant with a pipe.

   The following morning, at approximately six o'clock, complainant was warming up his car in front of his home when appellant appeared. Appellant approached the car, and taking a gun from his pocket, said to complainant, "I told you it wasn't over with." Complainant testified also that appellant then proceeded to fire four or five shots into the car. The complainant tried to avoid the gunfire, but was unable to do so. As a result, he sustained several gunshot wounds.

2. In my view, the importance of this evidence is highlighted by appellant's refusal to stipulate to it. While appellant maintains that the crime scene technician's testimony was not critical to any matter in issue, defense counsel told the court that he could "see no tactical advantage to waiving our right to confrontation as far as this

witness is concerned. That is why we have not agreed to stipulate to his testimony." Defense counsel's unwillingness to stipulate the evidence casts doubt on appellant's position that this evidence was "mere window dressing" for the government. Moreover, since appellant's defense was that he was not there and that someone else fired the shots, I fail to perceive how stipulating to this evidence would have been detrimental.

3. *See United States ex rel., Gibson v. Ziegele,* 479 F.2d 773 (3d Cir.), *cert. denied,* 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973), where the key prosecution witness who had been present on the first day of petitioner's murder trial suffered coronary insufficiency and was unable to testify, the United States Court of Appeals for the Third Circuit held that the trial court did not abuse its discretion in declaring a mistrial over petitioner's objection and that the Double Jeopardy Clause did not preclude petitioner's retrial. The majority distinguishes this case on the ground that in *Gibson,* the missing witness was a police captain to whom the defendant had

Finally, the majority opinion suggests that the prosecutor moved for a mistrial in an attempt to gain a tactical advantage because, so it is said, "the case was not proceeding smoothly." To support this conclusion the majority opinion relies on portions of the record which indicate that the prosecutor may have been surprised by the introduction of certain evidence at trial; to wit, the introduction of complainant's prior conviction of possession of a deadly weapon and the presentation at trial of the pipe allegedly used by complainant against appellant in their altercation of the previous day. *Cf. United States v. Jorn, supra,* 400 U.S. at 470, 91 S.Ct. at 547. My colleagues suggest also that the government moved for a mistrial in an attempt to gain a fresh start with a new trial. But there is nothing in the record tending to establish that the government's action was motivated by a desire to harass the accused or "to afford the prosecution with a more favorable opportunity to convict the defendant." *United States v. Dinitz,* 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267 (1976). In any event, I do not understand it to be the function of the court, nor should it be, to read between the lines of a cold record in an attempt to cull from it potentially improper motives of the prosecution.

More importantly, however, I fail to perceive why we should indulge a presumption of wrongdoing when the only issue of substance which need concern this court is whether the trial court abused its discretion in finding "manifest necessity" to declare a mistrial due to the unexpected absence of a key government witness. While courts have held that a second prosecution in cases of prosecutorial bad faith or error is prohibited by the Double Jeopardy

Clause because of the absence of "manifest necessity," *see United States v. Jorn, supra,* 400 U.S. at 470, 91 S.Ct. at 547; *Downum v. United States, supra,* 372 U.S. at 734, 83 S.Ct. at 1033; *Cornero v. United States,* 48 F.2d 69 (9th Cir.1931) (where retrial was barred when prosecutor participated in the jury selection process without first ascertaining whether or not his witnesses were present) there is simply nothing in the case at bar which suggests that the unavailability of the officer as a witness resulted from the bad faith of the government. In fact, it is undisputed in the record that when the trial began, the Assistant United States Attorney believed that the crime scene technician officer would be available to testify as scheduled, and, had he not suffered medical complications, the officer would have testified. Thus, there is no showing whatsoever that the prosecutor had knowledge of the officer's condition or its severity until after the jury had been impaneled, opening statements had been completed, and the first government witness had testified.

While reviewing the prosecution's motion for a mistrial, repeated attempts were made by the trial judge to resolve the issue in a manner which would avoid discharging the jury. When the problem of the witness' illness arose, he conferred with counsel and gave each a fair opportunity to explain his position with regard to how the trial should proceed. However, after determining that no satisfactory solution existed, the trial court ruled that "in order to be as fair as possible to every [sic] side in this case, I'm going to grant the government's request for a mistrial.... If it appears after several months, the witness isn't going to be any better able to supply this

---

made a confession. The Third Circuit concluded that since the confession was the most important element in the government's case and it could only be introduced through the missing witness, double jeopardy did not attach.

The majority says that the crime scene technician's testimony was not the most important element in the government's case, therefore, *Gibson* should not control. I disagree. In the instant case, the missing testimony would have

bolstered the testimony of the victim and only eyewitness to the shooting. Clearly, the complainant's testimony was the most important element of the government's case. Once he was impeached, it was incumbent upon the prosecution to corroborate the victim's version of the shooting. Thus, while the absent officer's testimony may not have been the most important element of the government's case, it certainly was a significant and critical part of it.

information, then I think we're going to have to consider throwing the case out."

It is obvious that the trial court was confronted with a difficult situation in this case but was amenable to suggestions from both counsel.[4]  In view of the witness' disability, however, the trial court concluded that appellant's right to have the trial completed at that time was subordinate to the public's interest in a fair and meaningful trial designed to end in a just judgment. *See Wade v. Hunter, supra,* 336 U.S. at 689, 69 S.Ct. at 837.  Consequently, where, as here, the trial court has properly explored the appropriate alternatives to the discharge of the jury and there is a sufficient basis in the record for the declaration of a mistrial, this court should not disturb the trial court's exercise of discretion. *Hall v. Potoker,* 49 N.Y.2d 501, 427 N.Y. S.2d 211, 403 N.E.2d 1210 (1980).

Applying the standards of manifest necessity and public justice to the facts in this case, I would hold that the trial judge did not abuse his discretion in declaring over appellant's objection a mistrial.

Accordingly, I respectfully dissent.

---

**4.** In reviewing the record, I note that in granting the government's motion for a mistrial, the trial court reserved the opportunity to "throw the case out" if, after several months, the officer was still unavailable to testify.  The fifth amendment prohibition against double jeopardy "was designed ... [to prevent] repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent, he may be found guilty." *Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199 (1957).  By retaining supervision over the case, the trial judge's action was appropriate since it was consistent with the spirit of the Double Jeopardy Clause.