STATE OF CONNECTICUT *v.* JOHN VAN SANT
(12627)

HEALEY, SHEA, DANNEHY, SANTANIELLO and MENT, Js.

Argued November 15, 1985—decision released January 21, 1986

*Robert M. Davidson,* with whom was *Thomas M. Conroy,* for the appellant (defendant).

*Frank S. Maco,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. This appeal arises out of the trial court's declaration of a mistrial, over the defendant's objection, on the ground of manifest necessity after a state's witness became ill while testifying. We find no error.

The defendant, John Van Sant, had been brought to trial on charges of larceny in the first degree in violation of General Statutes (Rev. to 1981) § 53a-122 (a) (2) and burglary in the third degree in violation of General Statutes § 53a-103 (a). On September 20, 1983, after a jury had been impaneled, the state called as a witness Bernard Halapin, a Monroe police detective. In the course of cross-examination, the court, *Melville, J.,* excused the jury, as well as Halapin, to permit defense counsel to make a motion. The defense asked the court to "suspend [the] trial,"[1] arguing that testimony being given by Halapin was inconsistent with that given by him the previous day at a hearing on the defendant's motion to suppress, which had been denied by the court. The court itself stated that it had "a serious problem here, Mr. Maco. It would appear that we have two sets of testimony from this officer . . . [t]he Court is now receiving a different impression from what the testimony has just been . . . ." Still outside the presence of the jury, Halapin returned to the witness stand, after the court indicated that defense counsel could probe the claimed contradiction. After examination of Halapin by the defense and the state, as well as the court, the court said that its earlier decision to deny the motion to suppress remained unchanged.[2] Thereafter, while

---

[1] At that time defense counsel said, inter alia: "I don't find it shocking, I just find it prejudicial, and I would request the Court to suspend this trial, I am not asking for a mistrial, but only to suspend it to reconduct the suppression hearing so we can get into further facts and to try to figure out what really went on on that day and what was really in the police mind [sic]."

[2] An examination of the transcript of September 20, 1983, discloses that defense counsel exercised the opportunity given by the trial court to question Halapin on his claims.

Halapin was being questioned by defense counsel, he became ill and was removed from the courthouse.

His appearance at that time was described by the court at a hearing some time later as follows: "The Court certainly had the benefit of observing the demeanor of the witness at the time he keeled over on the stand, and the Court at that time was convinced that there was no malingering going on. The Court could notice the beads of sweat, the perspiration on the man's brows and the face, and the change in his color. It was obvious that there was something drastically wrong with the individual." The next day the court told the jury that "a logistical problem" had been encountered which had not been solved and for that reason it was excusing them until September 28, 1983, at which time they were to return to court.

On October 12, 1983, the trial court conducted a hearing at which James D. Garrity, a family physician who had examined Halapin, testified. This physician was called as the court's witness and was examined by the court, the state and the defense. The court made clear that the purpose of the hearing was to determine whether there was manifest necessity to declare a mistrial. Garrity had examined Halapin on September 20, 1983, and referred him to Kenneth Lisi, a cardiologist. On September 29, 1983, Lisi performed a stress test on Halapin and reported the results to Garrity. Garrity testified that, as a result, "[w]e told [Halapin] to return to his regular duty, but not to testify in court." In addition, Garrity said that the last time that Halapin had notified him that he experienced pain was the day of the stress test. It appeared that Garrity relied heavily on Lisi's expertise.[3] No definite statement was given as to when Halapin could medically be expected to be

---

[3] Garrity did testify that he had performed other cardiograms on Halapin before the instant one and that Lisi did say that the present one "was abnor-

able to testify in court. The trial court felt that Garrity's
evidence had not been particularly helpful, noting that
Halapin had been permitted to return to work despite
the concession by Garrity that he did not know the
"kind of stresses he might be subjected to" at work,
that he did not know if he had in fact returned to work,
and that Halapin's availability as a witness was unclear.
Moreover, the court also noted that it did not know
what Lisi had actually said. It is apparent that, at that
point, the court did not consider that proceeding with
the trial, either by striking Halapin's testimony and
allowing the state to proceed out of order or by allow-
ing a "significant additional continuance," offered fair
choices, especially without the consent of the defense.
Observing that the state offered two notes, a letter and
the testimony of Garrity, the trial court stated that
"none of [this] indicated anything definitive as to when
this man [Halapin] could come back or what his condi-
tion was." It then indicated that it wanted something
more from the state. After a further colloquy, the mat-
ter was continued for one day and the state was then
to bring in Halapin or a cardiologist or both.[4]

On the following day, October 13, 1983, the state pro-
duced, and the court admitted, over the defense objec-
tion of hearsay, a letter from Lisi to the attention of
Frank S. Maco, the assistant state's attorney trying
the case. The state also informed the court that Halapin
was present in the courthouse in the state's attorney's
office in accordance with the court's instructions,

mal as against the other one." He could not, however, "translate" the note
he had from Lisi on that "abnormality" as he "would have to have a cardi-
ologist do it."

[4] The following took place at that time: "Mr. Maco: Just so the State is
clear with regard to your Honor's ruling, you want the witness and/or a
cardiologist and you are putting the burden now on the State as to why,
in fact, this witness has not appeared to testify?

"The Court: Well, if you want to take it that way, fine." The defendant
objected to the continuance.

although it had not brought "him into this courtroom atmosphere at this time unless requested by the Court . . . ." The state maintained, in answer to a question from the court, that it still took the position that it intended to proceed if the court so ordered.

Lisi's letter indicated that Halapin had reported having chest pain during the stress test the doctor was conducting and that he had to assume Halapin's pain was real although he could not so state. Lisi maintained that the only way to determine whether it was "truly organic pain" was through coronary angiography which, in turn, was not indicated unless further episodes of chest pain occurred. He felt that it was "only right" to conclude that Halapin should not be exposed "to any maximum stress at this time." Pointing out that, in Halapin's case, "the court proceedings are equivalent to a Stage IV stress test because of the anxiety it creates," he did not feel it was "safe at this point to expose him to such a stressful procedure until more information [could] be obtained." He also reported that he could "eventually" assume his police duties "but in a graduated manner." If pain did not recur, "he [could] undergo cross-examination as organic pain would certainly not be probable." He further said that the electrocardiogram mentioned by Garrity revealed "a normal congenital variation and is of no medical significance." Lisi, however, then wrote that "a previous ECG apparently did not reveal this pattern which would suggest that it is development [sic] rather than congenital," but he also noted "[w]hether this is significant or not is questionable." He concluded that the stress test was inconclusive, that the pain "has to be presumed to be real rather than imaginary" and that "marked stress, physical or emotional, at this time has to be avoided."

The court determined that Halapin was in the courthouse and that the state was ready, willing and able

to proceed with Halapin as a witness if ordered to do so. The state informed the court that, as of October 13, 1983, Halapin was not back to work. The defendant declined the court's offer of a reasonable continuance to present information or evidence that would justify the court's ordering Halapin to appear and testify. In declining the offered continuance, the defendant pointed out that it was not his burden, but that of the state, to go forward. The court did not, however, consider such an order appropriate "without further evidence" as it "could detrimentally affect his health." It denied the defendant's motion for judgment of acquittal and found that there was "manifest necessity" under the circumstance to declare a mistrial and it did so over the defendant's objection. It then ordered that the case be set down for a new trial and placed on the trial list.

On October 15, 1983, the defendant filed a motion to dismiss based on double jeopardy grounds. Over a year later, on October 24, 1984, the judge who had declared the mistrial on October 13, 1983, heard and denied the defendant's motion to dismiss.[5] This appeal followed.

---

[5] The motion to dismiss stated: "The defendant in the above-entitled action, pursuant to Practice Book Sec. 815 (6), hereby moves to dismiss the information with prejudice on the grounds that to place the defendant on trial for the offenses alleged in the information would constitute double jeopardy in violation of the Fifth Amendment to the Constitution of the United States. No similar motion has been filed with this Court."

In oral argument before us, defense counsel indicated that when the defendant was called to appear for a second trial, the motion to dismiss on double jeopardy grounds was filed.

Ordinarily, the appealable final judgment in a criminal case is the imposition of sentence. *State* v. *Seravalli,* 189 Conn. 201, 205, 455 A.2d 852, cert. dismissed, 461 U.S. 920, 103 S. Ct. 2076, 77 L. Ed. 2d 291 (1983); *State* v. *Grotton,* 180 Conn. 290, 293, 429 A.2d 871 (1980). This rule of finality we have made subject to several narrowly defined exceptions; see, e.g., *State* v. *Grotton,* supra; one of which is "an order denying a motion to dismiss on the ground that the state's prosecution places the defendant in double jeopardy." *State* v. *Grotton,* supra; see *State* v. *Seravalli,* supra, 203–204;

On appeal, the defendant claims that the trial court erred in (1) permitting the defendant to be subjected to jeopardy for the second time after the declaration of a mistrial which was based on inadmissible hearsay evidence, and (2) ruling that manifest necessity existed for declaring the mistrial because of the alleged illness of a state's witness where the medical evidence of that witness' condition was ambiguous and where the witness was in the courthouse on the day the mistrial was declared. We find no error.

The defendant claims that the evidence properly before the trial court did not constitute manifest necessity for it to declare the mistrial and, therefore, that its action constituted an abuse of discretion. The trial court's action, it is argued, was prejudicial and violated his constitutional right not to be placed in jeopardy a second time. Those claims encompass the argument that the state did not satisfy its heavy burden and that the trial court's reliance on the inadmissible hearsay evidence represented by Lisi's letter constituted reversible error. The state, on the other hand, recognizing that a mistrial premised on the claimed unavailability of "crucial prosecution evidence" triggers the "strictest scrutiny" of such a claim, argues that the trial court did not abuse its discretion. In addition, it asserts that the trial court did not commit error in admitting into evidence, and relying upon, Lisi's letter in considering whether or not to declare a mistrial. Overall, the

see also *Abney* v. *United States,* 431 U.S. 651, 657, 97 S. Ct. 2034, 52 L. Ed. 2d 651 (1977); *State* v. *Curcio,* 191 Conn. 27, 463 A.2d 566 (1983). The trial court's denial of the defendant's motion to dismiss on the ground of double jeopardy is therefore properly appealable to this court. We note that the defendant's motion to dismiss invokes the double jeopardy provision of the fifth amendment to the United States constitution. "Although the Connecticut constitution contains no specific double jeopardy provision, the due process guarantees of article first, § 8, have been held to include such a protection." *State* v. *Rawls,* 198 Conn. 111, 113 n.3, 502 A.2d 374 (1985); see *State* v. *Moeller,* 178 Conn. 67, 77, 420 A.2d 1153, cert. denied, 444 U.S. 950, 100 S. Ct. 423, 62 L. Ed. 2d 320 (1979).

state urges, the requisites of the doctrine of "manifest necessity" were present and proved.

The fifth amendment to the United States constitution provides, in relevant part, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." "This clause, which is applicable to the states through the fourteenth amendment; *Benton* v. *Maryland,* 395 U.S. 784, 787, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969); establishes the constitutional standards concerning the guarantee against double jeopardy. *Crist* v. *Bretz,* 437 U.S. 28, 98 S. Ct. 2156, 57 L. Ed. 2d 24 (1978); *Benton* v. *Maryland,* supra, 795." *State* v. *Roy,* 182 Conn. 382, 385, 438 A.2d 128 (1980); see *Arizona* v. *Washington,* 434 U.S. 497, 503, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978). Inasmuch as the jury had been selected and sworn in this case, jeopardy had attached. *Crist* v. *Bretz,* supra; *United States* v. *Jorn,* 400 U.S. 470, 479, 91 S. Ct. 547, 27 L. Ed. 2d 543 (1971); *State* v. *Roy,* supra. The fact that jeopardy has attached does not, however, mean that a later termination of the trial mandates a dismissal of the charge based on the double jeopardy clause. *United States* v. *Jorn,* supra, 483–84; *State* v. *Roy,* supra; *State* v. *Aillon,* 182 Conn. 124, 128, 438 A.2d 30 (1980), cert. denied, 449 U.S. 1090, 101 S. Ct. 883, 66 L. Ed. 2d 817 (1981); see generally Schulhofer, "Jeopardy and Mistrials," 125 U. Pa. L. Rev. 449 (1977). This is so even though this "constitutional protection also embraces the defendant's 'valued right to have his trial completed by a particular tribunal.' " *Arizona* v. *Washington,* supra. It is instructive to note that the "valued right" quotation utilized by Justice Stevens in writing for the court in *Arizona* v. *Washington,* supra, is acknowledged to have had its source in Justice Black's opinion in *Wade* v. *Hunter,* 336 U.S. 684, 689, 69 S. Ct. 834, 93 L. Ed. 974, reh. denied, 337 U.S. 921, 69 S. Ct. 1152, 93 L. Ed. 1730 (1949), where he

said: "What has been said is enough to show that a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."[6] See generally Holleman, "Mistrials and the Double Jeopardy Clause," 14 Ga. L. Rev. 45, 47 (1979).

Thus, the fact that jeopardy has attached does not mean that a later termination of the trial necessarily mandates a dismissal of the charge on the basis of the double jeopardy clause. When a criminal defendant objects to the declaration of a mistrial, as he did in the case before us, and the mistrial is declared for reasons amounting to "manifest necessity," his right to have his trial completed by his chosen tribunal is no longer protected and the double jeopardy clause does not bar a second trial. *Illinois* v. *Somerville,* 410 U.S. 458, 462, 93 S. Ct. 1066, 35 L. Ed. 2d 425 (1973); *Gori* v. *United States,* 367 U.S. 364, 368, 81 S. Ct. 1523, 6 L. Ed. 2d 901 (1961); *United States* v. *Perez,* 22 U.S. (9 Wheat.) 579, 6 L. Ed. 165 (1824); *State* v. *Roy,* supra, 386; *Matter of Plummer* v. *Rothwax,* 63 N.Y.2d 243, 471 N.E.2d 429, 481 N.Y.S.2d 657 (1984).

In construing the double jeopardy clause of the United States constitution in the context of a declaration of a mistrial over a defendant's objection, the seminal decision is *United States* v. *Perez,* supra. It has enjoyed continued vitality. See, e.g., *Arizona* v. *Washington,* supra, 506; *United States* v. *Dinitz,* 424 U.S. 600, 606–607, 96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976); *Illinois* v. *Somerville,* supra, 461; *Wade* v. *Hunter,* supra, 689–90; *Simmons* v. *United States,* 142

---

[6] In referring to this sentence in *Arizona* v. *Washington,* 434 U.S. 497, 503 n.11, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978), Justice Stevens observes that "[Justice Black's] complete sentence identifies that right as sometimes subordinate to a larger interest in having the trial end in a just judgment . . . ."

U.S. 148, 153–54, 12 S. Ct. 171, 35 L. Ed. 968 (1891);
*State* v. *Roy,* supra; *State* v. *Aillon,* supra; *Costarelli*
v. *Commonwealth,* 374 Mass. 677, 682, 373 N.E.2d 1183
(1978); *Matter of Plummer* v. *Rothwax,* supra; *State* v.
*Duckett,* 120 Wis. 2d 646, 649–50, 358 N.W.2d 300
(1984).

Justice Story, writing for the United States Supreme
Court in *Perez,* set forth standards for determining
when to order a retrial after the declaration of a mis-
trial over the defendant's objection. He said: "We think,
that in all cases of this nature, the law has invested
Courts of justice with the authority to discharge a jury
from giving any verdict, whenever, in their opinion, tak-
ing all the circumstances into consideration, there is
a manifest necessity for the act, or the ends of public
justice would otherwise be defeated. They are to exer-
cise a sound discretion on the subject; and it is impos-
sible to define all the circumstances, which would
render it proper to interfere. To be sure, the power
ought to be used with the greatest caution, under
urgent circumstances, and for very plain and obvious
causes; and, in capital cases especially, Courts should
be extremely careful how they interfere with any of
the chances of life, in favor of the prisoner. But, after
all, they have the right to order the discharge; and the
security which the public have for the faithful, sound,
and conscientious exercise of this discretion, rests, in
this, as in other cases, upon the responsibility of the
Judges, under their oaths of office." *United States* v.
*Perez,* supra, 580.

It must be acknowledged that the *Arizona* court
posits that "[t]he words 'manifest necessity' appropri-
ately characterize the magnitude of the prosecutor's
burden." *Arizona* v. *Washington,* supra, 505. Because
of the importance of the defendant's right to have his
trial concluded by a particular tribunal, "the prosecu-
tor must shoulder the burden of justifying the mistrial

if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant." Id.[7] With respect to construction of the terms "manifest necessity," a "high degree" of "necessity" is required before a conclusion may be reached that a mistrial is appropriate, and it is apparent that whether that "high degree" has been reached is to be answered more easily in some kinds of cases than others. Id., 506–507. Manifest necessity is not amenable to a precise formulation or mechanical application because the "high degree" of necessity mandated by that phrase can be found in a variety of circumstances. Id.; *Illinois* v. *Somerville,* supra, 462; *Abdi* v. *Georgia,* 744 F.2d 1500, 1503 (11th Cir. 1984), cert. denied, 471 U.S. 1006, 105 S. Ct. 1871, 85 L. Ed. 2d 164 (1985); *Elder* v. *Commonwealth,* 385 Mass. 128, 133, 431 N.E.2d 571 (1982).

"A reviewing court looks for a manifest necessity by examining the entire record in the case without limiting itself to the actual findings of the trial court. *Grooms* v. *Wainwright,* 610 F.2d 344 (5th Cir. 1980), cert. denied, 445 U.S. 953, 100 S. Ct. 1605, 63 L. Ed. 2d 789 (1980)." *Abdi* v. *Georgia,* supra; see *Arizona* v. *Washington,* supra, 515–17; *Wade* v. *Hunter,* supra, 691–92. It is the examination of the propriety of the trial court's action against the backdrop of the record that leads to the determination whether, in the context of a particular case, the mistrial declaration was proper. Given the constitutionally protected interest involved, reviewing courts must be satisfied, in the words of Justice Story in *Perez,* that the trial judge exercised "sound discretion" in declaring a mistrial.

---

[7] The United States Supreme Court has pointed out that "[d]ifferent considerations obtain, however, when the mistrial has been declared at the defendant's request." *United States* v. *Dinitz,* 424 U.S. 600, 607, 96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976).

See *Arizona* v. *Washington,* supra, 514; *Illinois* v. *Somerville,* supra, 462; *Wade* v. *Hunter,* supra, 692; *United States* v. *Castellanos,* 478 F.2d 749, 751 (2d Cir. 1973); *State* v. *Roy,* supra, 386; *State* v. *Aillon,* supra, 129, 134. The "strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence . . . ." *Arizona* v. *Washington,* supra, 508; *Hall* v. *Potoker,* 49 N.Y.2d 501, 506, 403 N.E.2d 1210, 427 N.Y.S.2d 211 (1980); *Routh* v. *United States,* 483 A.2d 638, 642 (D.C. App. 1984). A longstanding reason for permitting a second trial is when the jury impaneled for the first trial is unable to agree and has been discharged over the defendant's objection. *Downum* v. *United States,* 372 U.S. 734, 735–36, 83 S. Ct. 1033, 10 L. Ed. 2d 100 (1963). The United States Supreme Court has refused, however, to state that the absence of witnesses " 'can never justify discontinuance of a trial,' " but instead has reasserted that "[e]ach case must turn on its facts." Id., 737; *Wade* v. *Hunter,* supra, 691.

In evaluating the trial judge's exercise of discretion, we initially note the significant circumstance that the trial judge personally witnessed Halapin as "he keeled over on the stand," that he noticed "the beads of sweat, the perspiration on the man's brows, and the change in his color." The court stated that it was "obvious that there was something drastically wrong with [Halapin]" and that at that time it "was convinced that there was no malingering going on."[8] This "seizure" took place after some of the state's witnesses had already testified and after Halapin himself had become enmeshed in some inconsistency vis-a-vis his earlier testimony on the motion to suppress which the trial court indicated raised questions about his trial testimony.

---

[8] During its argument in the trial court the state argued that the trial court "also had the opportunity to observe medical personnel come into the building and remove [Halapin] on a stretcher."

The record discloses that from the outset of this dilemma the trial judge sought scrupulously to protect the interests of both the defendant and the state. He was painfully aware of neither advantaging nor disadvantaging any of those interests. Prior to exercising its discretion and declaring the mistrial, the trial court proceeded deliberately and not precipitously; *Arizona* v. *Washington,* supra, 515; even though not acting for about three weeks after Halapin's seizure. Cf. *United States* v. *Jorn,* supra, 487; see *Brady* v. *Samaha,* 667 F.2d 224, 229 (1st Cir. 1981). It is important to point out that the record demonstrates that the trial court realistically considered the alternatives to a mistrial;[9] see, e.g., *United States* v. *Jorn,* supra; *Abdi* v. *Georgia,* supra, 1501–1502; *Dunkerley* v. *Hogan,* 579 F.2d 141, 146–48 (2d Cir. 1978), cert. denied, 439 U.S. 1090, 99 S. Ct. 872, 59 L. Ed. 2d 56 (1979); and only then declared the mistrial.[10] Moreover, the trial court properly, as it should have, gave counsel the opportunity to be heard extensively on the matter.[11] *Arizona* v. *Washington,* supra, 514–15 n.34; *United States* v. *Pierce,* 593 F.2d

[9] Counsel have not directed us to any reported decision where the witness, whose indisposition generated a later mistrial, became ill while actually testifying at the trial. Cf. *United States ex rel. Gibson* v. *Ziegele,* 479 F.2d 773 (3d Cir.), cert. denied, 414 U.S. 1008, 94 S. Ct. 370, 38 L. Ed. 2d 246 (1973); *Routh* v. *United States,* 483 A.2d 638 (D.C. App. 1984); *People* v. *Castro,* 657 P.2d 932 (Colo. 1983); *Hall* v. *Potoker,* 49 N.Y.2d 501, 403 N.E.2d 1210, 427 N.Y.S.2d 211 (1980); *State* v. *Misten,* 26 Or. App. 681, 554 P.2d 584 (1976).

[10] A trial judge has acted within his sound discretion in rejecting possible alternatives in granting a mistrial if reasonable judges could differ about the proper disposition, even where, "[i]n a strict literal sense, the mistrial [is] not necessary." *Cherry* v. *Director, State Board of Corrections,* 635 F.2d 414, 419 (5th Cir.), cert. denied, 454 U.S. 840, 102 S. Ct. 150, 70 L. Ed. 2d 124 (1981); *Arizona* v. *Washington,* 434 U.S. 497, 511, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978); *Grandberry* v. *Bonner,* 653 F.2d 1010, 1014, reh. denied, 660 F.2d 497 (5th Cir. 1981).

[11] It would appear from the record that the trial court also gave the defendant the opportunity to present evidence or information to be considered by the trial court in deciding whether to declare a mistrial. While this offer was commendable, we agree with the defendant's argument that the bur-

415, 417–19 (1st Cir. 1979). The double jeopardy impli-
cations of the ruling were also considered by the court.
Cf. *Brady* v. *Samaha,* supra, 228–29. In invoking the
manifest necessity standard, the trial court carefully
weighed the defendant's right to have his trial com-
pleted, thus avoiding a retrial for the same offense, and
the public's interest in a fair trial and just judgment.
Its analysis of the evidence, including the medical evi-
dence, and its awareness of the applicable law evince
a reasoned resolution of the dilemma that existed. No
reasonable continuance would resolve the problem nor
would striking Halapin's testimony. There was no fair
basis upon which to estimate when Halapin could tes-
tify. The record shows that the court recognized that
"the knife cuts both ways" in assessing the circum-
stances for and against a mistrial. The court's reliance
on Lisi's letter was acknowledged. That letter not only
confirmed Garrity's testimony that Halapin should not
be exposed to the "stressful procedure" of the court
proceedings, but also indicated that the recent electro-
cardiogram suggested a pattern that was "development
[sic]" and not "congenital."

Before finally determining whether the trial court did
exercise a "sound discretion" under *Perez* and its
progeny, we turn to the defendant's claim that the
admission into evidence of Lisi's letter was harmful
error. The letter constituted hearsay. Garrity, who had
referred Halapin to Lisi, a cardiologist, had appeared
and testified that both were of the opinion that the wit-
ness should not be subjected to testifying. During his
testimony, Garrity spoke of his "no court" advice to
Halapin based not only on his contact with Halapin but,
in great measure, upon Lisi's views. In addition, he indi-

---

den of demonstrating manifest necessity for a mistrial to avoid the double
jeopardy bar was entirely on the state. See, e.g., *Arizona* v. *Washington,*
434 U.S. 497, 505–506, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978); *Routh* v.
*United States,* 483 A.2d 638, 642 (D.C. App. 1984).

cated that the recent electrocardiogram was "abnormal" although he was unable to "translate" for the court certain notes he had from Lisi as he testified. In the trial court, the defendant objected to the letter because it was hearsay and because it contained a suggestion with no basis in the letter "that a Court proceeding is some sort of a number IV stress, and the witness can't come because it is stressful to him." He then said that "I think this letter provides us with, frankly, absolutely nothing [other] than we already have in this case . . . ." The parties took opposing positions on the application and interpretation of the opinion of the New York Court of Appeals in *Hall* v. *Potoker,* supra, upon which the trial court placed reliance. In that case, the trial court took into account, in declaring a mistrial because of manifest necessity, the information given to the court and the defense by the prosecutor informing the court of the current opinion of the medical condition of an absent witness held by a physician who had earlier testified in court concerning that witness. The *Hall* court pointed out that the trial court was not "obliged to hale the doctor into court merely to repeat information relayed via the prosecutor." Id., 507. It is true that that court said that the doctor's testimony and his progress report relayed through the prosecutor stood "unimpeached and unrefuted." Id. The same is fairly true here as the medical information available to the trial court indicated that for Halapin to testify would be stressful and against the medical advice given him. In this case we agree with the reasoning of the *Hall* court where it said: "Although the information was technically hear say, a trial court considering the exigencies of a potential mistrial situation cannot be bound by the strict rules of evidence applicable at formal proceedings . . . . In such a situation a court must be free to act upon the information at hand, so long as it is reliable." Id.

We conclude that the information from the Lisi letter upon which the trial court relied, although hearsay, was reliable for the purposes of its use in this mistrial context. In so ruling, we are aware that "[t]he decision whether [a] mistrial is manifestly necessary is a 'practical matter', *Abney* v. *United States,* 431 U.S. 651, 658, 97 S. Ct. 2034, 52 L. Ed. 2d 651 (1977)." *United States* v. *Lynch,* 467 F. Sup. 575, 579 (D.D.C.), aff'd, 598 F.2d 132 (D.C. Cir. 1978), cert. denied, 440 U.S. 939, 99 S. Ct. 1287, 59 L. Ed. 2d 498 (1979). The court, in the course of exercising its discretion, was in a situation that gave it the reasonable assurance of the validity of the hearsay, and the circumstances warranted its use. Particularly is this so because Garrity had already testified after consulting Lisi, and the defendant at trial asserted that the letter put nothing new in on the matter. Moreover, there is no claim at all in this case that the prosecution or the defense or the court had any indication of the dilemma when it occurred. We conclude, therefore, that the trial court did not commit error in admitting the letter.

The decision to declare a mistrial rests in the sound discretion of the trial judge who is best situated to take all the circumstances into account and to decide whether a mistrial is in fact required in a given case. See, e.g., *Illinois* v. *Somerville,* supra, 462; *Matter of Plummer* v. *Rothwax,* supra, 250; *Hall* v. *Potoker,* supra; *State* v. *Aillon,* supra. This, too, is not a case of either prosecutorial or judicial overreaching. See *United States* v. *Jorn,* supra, 485. It is a case in which, after according not only the deference due the trial court's decision but also subjecting that decision to the "strictest scrutiny," we conclude that there was an exercise of the requisite sound discretion in declaring the mistrial.

There is no error.

In this opinion DANNEHY, SANTANIELLO and MENT, Js., concurred.

SHEA, J., concurring. I disagree only with the portion of the opinion that holds it was not erroneous for the trial court, in disregard of the hearsay rule, to admit in evidence the letter of the cardiologist for the purpose of deciding whether there was a "manifest necessity" to declare a mistrial. As the opinion acknowledges, in the absence of such necessity the defendant's constitutional right not to be twice placed in jeopardy would be violated. The propriety of granting a mistrial over the defendant's objection in a criminal case raises an issue of serious constitutional concern. To the extent that the determination turns upon the resolution of factual issues, such as the unavailability of a witness, evidence bearing thereon should be subject to the defendant's rights of cross-examination and confrontation, which the hearsay rule serves to implement. General Statutes § 52-174, which does allow the report of a physician to be introduced in "actions for the recovery of damages for personal injuries or death," ought not to be extended to criminal cases in defiance of the apparent legislative intention, as the opinion has effectually done by suspending the operation of the hearsay rule in a proceeding to determine such a critical constitutional issue as double jeopardy.

The case of *Hall* v. *Potoker*, 49 N.Y.2d 501, 403 N.E.2d 1210, 427 N.Y.S.2d 211 (1980), relied upon by the opinion, does not involve the *admissibility* of hearsay evidence in such a mistrial proceeding but simply its *reliability* where the out-of-court statements of a physician, who had previously testified, were reported to the court by the prosecutor without objection by the defendant. The issue raised on appeal was whether the court should have held an additional hearing on the con-

dition of the witness, as requested by the defendant the day after the physician's statements had come into the case, rather than rely upon that unstricken evidence.

I agree with the result, nevertheless, because the letter of the cardiologist added very little to the evidence produced at the earlier hearing where Garrity had testified concerning his patient's condition and had referred, without objection, to the findings of the cardiologist. Even without the letter, the record demonstrates adequate support for the granting of a mistrial.

Accordingly, I concur in the result.